EP MEDSYSTEMS, INC., Plaintiff,

v.

ECHOCATH, INC., Defendant.

No. Civ.A. 97–4926(AJL).

United States District Court,
D. New Jersey.

Oct. 19, 1998.

John J. Murphy, III, Stradley, Ronon, Stevens & Young, LLP, Cherry Hill, NJ, for Plaintiff.

Richard G. Primoff, Marc H. Supcoff, Rubin Baum Levin Constant & Friedman, New York City, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action brought by the plaintiff, EP Medsystems, Inc. ("EPM"), against the defendant, EchoCath, Inc., ("EchoCath"). In its amended complaint (the "Amended Complaint"), EPM alleges EchoCath made material misrepresentations to induce EPM to purchase 280,000 shares of preferred stock of EchoCath (the "Securities"). In count I of the Amended Complaint, EPM seeks damages for violations of Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j ("Section 10(b)"), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). *See* Amended Complaint at ¶¶ 28–35. In count II of the Amended Complaint, EPM seeks damages for common law fraud. *See* Amended Complaint at ¶¶ 36–40. Jurisdiction is asserted pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

Currently pending is a motion to dismiss (the "Motion to Dismiss") the Amended Complaint filed by EchoCath pursuant to Rules 9(b) ("Rule 9(b)") and 12(b)(6) ("Rule 12(b)(6)") of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367 ("Section 1367").[1]

---

**1.** In support of the Motion to Dismiss, EchoCath submitted: Notice of Motion to Dismiss the Amended Complaint; the affidavit of Frank A. DeBernardis (the "DeBernardis Aff.") attaching exhibits A through G; the Memorandum of Law in Support of Motion of Defendant EchoCath, Inc. to Dismiss the Amended Complaint (the "Moving Brief"); and Reply Memorandum of Law in Further Support of Defendant EchoCath, Inc.'s Motion to Dismiss the Amended Complaint (the "Reply Brief").

In opposition to the Motion to Dismiss, EPM submitted: Memorandum of Law of EP Medsystems, Inc. in Opposition to Defendant's Motion to Dismiss (the "Opposition Brief").

The documents relevant to the purchase of the Securities set out warning signals in plain language. These warning signals demonstrate that EPM cannot establish a reasonable investor would find the alleged misrepresentations and omissions material to the decision to invest in EchoCath. Accordingly, for the reasons set forth below, the Motion to Dismiss is granted.

*Background*

### A. *Procedural History*

On 7 October 1997, EPM commenced this action by filing a complaint (the "Complaint"). *See* Complaint. By letter, dated 13 November 1997, (the "13 November 1997 Letter") EchoCath advised EPM that it intended to move to dismiss the Complaint pursuant to Rule 9(b) and Rule 12(b)(6). *See* Exhibit A to DeBernardis Aff. at 1. EchoCath sent the 13 November 1997 Letter to put EPM on notice concerning deficiencies EchoCath found in the Complaint. This notification gave EPM an opportunity to amend the Complaint to correct the deficiencies and perhaps moot the Motion to Dismiss before it was filed.

On 26 November 1997, EchoCath filed an answer to the Complaint (the "Answer to the Complaint") and a counterclaim (the "Counterclaim") against EPM. *See* Answer to the Complaint. On 9 December 1997, EPM filed an answer to the Counterclaim (the "Answer to the Counterclaim"). *See* Answer to the Counterclaim.

On 3 December 1997, in response to the 13 November 1997 letter, EPM filed the Amended Complaint. *See* Amended Complaint. On 10 December 1997, EchoCath filed an answer to the Amended Complaint (the "Answer to the Amended Complaint") and a counterclaim against EPM. *See* Answer to the Amended Complaint. EchoCath thereafter filed the Motion to Dismiss.

**2.** The facts are derived from the Amended Complaint. As discussed more fully below, for purposes of a Rule 12(b)(6) motion, the factual allegations of the complaint, as well as all reasonable inferences which may be drawn therefrom, are accepted as true. *See, e.g., Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.

### B. *Facts*[2]

EPM is involved in the development, marketing and sale of cardiac electrophysiology products used to diagnose, monitor and treat certain disorders. *See* Amended Complaint at ¶ 5.

In August 1996, the President and Chief Executive Officer of EPM, David Jenkins ("Jenkins"), together with the EPM Chief Financial Officer, James Caruso, ("Caruso") and Anthony Varricchio ("Varricchio"), a member of the EPM board of directors, traveled to the EchoCath plant to meet with the senior management of EchoCath (the "August 1996 Meeting"). *See* Amended Complaint at ¶ 9. The purpose of the August 1996 Meeting was to provide EPM management with a tour of the EchoCath facility and to give EPM management an opportunity to evaluate the technology under development by EchoCath. *See id.* From the August 1996 Meeting, EchoCath hoped EPM would be willing to invest in it.

While at the EchoCath plant, Jenkins, Caruso and Varricchio met with Frank DeBernardis ("DeBernardis"), the EchoCath President and Chief Executive Officer, and David Vilkomerson ("Vilkomerson"), the EchoCath Executive Vice President and Director of Research. *See id.* During the August 1996 Meeting, DeBernardis made a presentation in which he detailed the ongoing commitment of EchoCath to develop and market a line of health products for women. *See id.* at ¶ 10. According to DeBernardis, these products included a SSG catheter and a breast biopsy needle. *See id.* The Amended Complaint refers to these products generally as "women's health products." *See id.* at ¶¶ 10, 11, 12, 14, 16, 17, 19, 21. It appears the EchoCath sales projections specifically refer to the SSG catheter and the biopsy needle as "EchoMark" and "ColorMark," respectively. *See id.* at ¶ 14; *see also* Moving Brief at 16 n. 8.

1997); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997); *Lewis v. Chrysler Corp.,* 949 F.2d 644, 646 n. 1 (3d Cir. 1991); *Weiner v. Quaker Oats Co.,* 928 F.Supp. 1372, 1380–81 (D.N.J.1996), *rev'd in part on other grounds,* 129 F.3d 310 (3d Cir.1997).

In the course of the August 1996 Meeting, DeBernardis identified several contracts which EchoCath intended to enter into with third parties for the marketing and development of its health products for women. *See* Amended Complaint at ¶ 15. DeBernardis represented:

> EchoCath had engaged in lengthy negotiations with and was on the verge of signing contracts with a number of companies including UroHealth [ ("UroHealth") ], Johnson & Johnson [ ("J & J") ], Medtronic [ ("Medtronic") ] and C.R. Bard, Inc. [ ("Bard") ] to develop and market these women's health products.

*See id.* at ¶ 10. It appears none of these contracts were consummated. *See id.* at ¶¶ 17–19.

EPM asserts the oral representations made by DeBernardis at the August 1996 meeting were "similar to" the written representations EchoCath had made in the 17 January 1996 prospectus (the "17 January 1996 Prospectus").[3] *See* Amended Complaint at ¶ 11. The 17 January 1996 Prospectus, issued by EchoCath in connection with its initial public offering of stock, contained an abundance of warnings and cautionary language which bore directly on the risky, perhaps even speculative, nature of the investment EPM made in EchoCath. It contained, *inter alia*, the following statements:

> [EchoCath] has developed a product (the "ColorMark Clip") utilizing the ColorMark technology ... [and] [EchoCath] has developed a catheter utilizing the EchoMark technology....

17 January 1996 Prospectus at 3.

> [EchoCath] intends to use a portion of the proceeds of the Offering to market th[e] [catheter utilizing EchoMark technology].

*Id.* at 3–4; *see* Amended Complaint at ¶ 11.

> Although [EchoCath] will allocate a portion of the proceeds of the Offering for the continued development of these products, the commercialization of any products incorporating these technologies, as well as any other proposed products utilizing

[EchoCath's] technologies, will depend upon [EchoCath's] ability to obtain additional financing through joint ventures, licensing agreements or other collaborative arrangements or otherwise.

17 January 1996 Prospectus at 3–4.

> **[EchoCath] is a development stage company which has limited sales and which has incurred substantial losses since inception. An investment in the securities offered hereby is speculative in nature and involves a high degree of risk.** Prior to making any investment decision, prospective investors should read and carefully review the 'Risk Factors' section of this Prospectus.

*Id.* at 5 (emphasis added).

> Among the factors cited by the auditors as raising **substantial doubt as to [Echo-Cath's] ability to continue as a going concern is that [EchoCath] has incurred losses since inception** and is expected to continue to incur losses and is in need of substantial funds. **There can be no assurance that [EchoCath] will ever achieve significant revenues or profitable operations.**

*Id.* at 7 (citing Report of Independent Certified Public Accountants) (emphasis added).

> [EchoCath] believes that the net proceeds from the Offering, together with funds expected to be generated from operations, will be sufficient to meet its cash requirements for approximately 12 to 18 months following consummation of the Offering; however, **there can be no assurance that [EchoCath] will not require additional financing** prior to that time or that, if required, additional financing will be available on acceptable terms or at all. **In any event, [EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.**

*Id.* at 7 (emphasis added); *see id.* at 23 (repeating representations).

> **[EchoCath] has no binding commitments from any third parties to provide**

---

**3.** The 17 January 1996 Prospectus was referred to in the Amended Complaint but was not attached to it. *See* Amended Complaint at ¶ 11.

funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to [EchoCath], if at all. Failure to obtain such additional financing would have a material adverse effect on [EchoCath's] business and prospects and could require [EchoCath] to seriously limit or cease its operations.... Former sources of capital are not obligated and are not expected to contribute, loan or provide any additional financing to [EchoCath].

*Id.* at 7 (emphasis added); *see id.* at 23 (repeating representations).

The commercial success of [EchoCath's] ColorMark Clip [and] the EchoMark EP Catheter, ... as well as [EchoCath's] other products and proposed products, will depend upon acceptance of such products by the medical community as safe, useful, and cost-effective.... The future success of [EchoCath] will depend, in part, on the degree of clinical acceptance of ultrasound imaging as opposed to competing technologies as well as on acceptance of [EchoCath's] products for ultrasound imaging applications.

*Id.* at 7–8.

[EchoCath] intends to pursue licensing, joint development and other collaborative arrangements with other strategic partners. There can be no assurance, however, that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies.

*Id.* at 8 (emphasis added); *see id.* at 24 (repeating representations).

[EchoCath] has limited manufacturing and assembly experience and to date has not yet manufactured any of its products in significant quantity. No assurance can be given that [EchoCath] will ever be able to establish commercial scale manufacturing operations.

*Id.* at 8 (emphasis added); *see id.* at 31 ("[EchoCath] currently does not have written agreements with any of its suppliers for manufacturing or assembly.") (emphasis added).

[EchoCath's] future success will depend in part upon its ability to attract and retain highly qualified personnel. [EchoCath] faces competition for such personnel from other companies, academic institutions, government entities, and other organizations, many of which have significantly greater resources than [EchoCath.] There can be no assurance that [EchoCath] will be able to attract and retain the necessary personnel on acceptable terms or at all.

*See id.* at 8; *see also id.* at 31.

[EchoCath] has not yet developed a sales organization to market and sell any of its products and there can be no assurance that [EchoCath] will be successful in establishing a sales organization or as to the effectiveness of such sales organization.... There can be no assurance that [EchoCath] will be successful in entering into any such arrangements or be able to effectively manage and maintain its relationships with others, or that any marketing and sales efforts undertaken by or on behalf of [EchoCath] by others will be successful.

*See id.* at 9 (emphasis added); *see also id.* at 31 (repeating representations).

[EchoCath] considers patent protection of its technologies to be critical to its business prospects. There can be no assurance that [EchoCath's] pending patent applications will issue as patents, that any issued patents will provide [EchoCath] with significant competitive advantages or that challenges will not be instituted against the validity or enforceability of any patent owned by [EchoCath.] ... [T]here can be no assurance that others will not independently develop similar or more advanced technologies or design around aspects of [EchoCath's] technologies which may be patented or duplicate [EchoCath's] trade secrets.

*See id.* at 9 (emphasis added).

There can be no assurance that reimbursement [by various third-party payors such as Medicare, Medicaid, other government programs, and private insurance plans] for procedures utilizing [EchoCath's] products will be sufficient to cover the additional cost of [EchoCath's] products, or that fu-

ture reimbursement policies of payors will not adversely affect [EchoCath's] ability to sell its products on a profitable basis.

See id. at 10.

A purchaser in the Offering will experience immediate and substantial dilution[4] of approximately $4.24 per share or 85% from the initial public offering price per share of $5.00.

See id. at 11 (emphasis added).

The market price for securities of emerging and development stage bio-technology companies have historically been highly volatile. Future announcements concerning [EchoCath] or its competitors, including the results of testing, technological innovations or new commercial products, government regulations, developments concerning proprietary rights, litigation or public concern as to safety of [EchoCath's] proposed products may have a significant impact on the market price of [EchoCath's] securities.

See id. at 12.

[EchoCath] estimates that the net proceeds from the sale of the 1,400,000 Units offered in the Offering will be approximately $5,485,000 ($6,435,250 if the Over–Allotment Option is exercised in full) after deducting underwriting discounts and commissions and expenses of approximately $1,515,000 ($1,614,750 if the Over–Allotment Option is exercised in full).

See id. at 15.

[EchoCath] is a development stage company and has not conducted any significant operations to date or received any significant operating revenues and has limited assets.

See id. at 21 (emphasis added).

[EchoCath's] research and development and general and administrative expenses will increase following this Offering when [EchoCath] incurs substantial research and manufacturing expenses, expenses for the payment of salaries to officers and employees, and consulting fees which have recently increased and are expected to continue

to increase. [EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future. There can be no assurance that [EchoCath] will ever achieve profitable operations.

See id. at 21 (emphasis added); see also id. at 29 ("Expenditures for research and development will be ongoing.").

Since its inception, [EchoCath's] efforts have been principally devoted to research and development and raising capital, and [EchoCath] has sustained cumulative losses of approximately $(8,883,000) through November 30, 1995.... As of November 30, 1995, [EchoCath] had a working capital deficit of approximately $(2,079,000), an accumulated deficit of approximately $(5,680,000) and a stockholders' deficit of approximately $(2,398,000), which deficiencies are expected to increase.

See id. at 22.

[EchoCath's] operations have not generated significant revenues to date. [EchoCath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future. No assurance can be given that [EchoCath] will successfully commercialize any of its products or successfully develop any of its proposed products.

See id. at 24 (emphasis added).

EPM contends EchoCath continued to make specific statements to EPM about its products and business through early 1997 in an ongoing effort to persuade EPM to invest in EchoCath. See Amended Complaint at ¶ 18. For example, in December 1996, DeBernardis assured Caruso during a telephone conversation that EchoCath was actively moving forward with the health products for women which had been described during the August 1996 Meeting. See id. at ¶ 12.

---

4. "Dilution represents the difference between the initial public offering price per share paid by purchasers in the Offering and the net tangible book value per share immediately after completion of the Offering." 17 January 1996 Prospectus at 14.

On 20 December 1996, DeBernardis delivered to Caruso a series of documents including a marketing plan and financial projections of EchoCath for fiscal years 1997 and 1998 (collectively, the "EchoCath Marketing Plan"). *See id.* at ¶ 13; EchoCath Marketing Plan. Attached to the EchoCath Marketing Plan was a document entitled, "EchoCath Operating Model," [5] dated 20 December 1996, (the "EchoCath Operating Model"), for the period November 1996 to October 1998. *See* Amended Complaint at ¶ 14.

The first page of the EchoCath Operating Model stated: "This Model is a simplified form of accounting, but does reflect accurately cash and income flows." *See* EchoCath Operating Model at 2. Regarding the sales of the health products for women, the EchoCath Operating Model also stated:

As shown, ColorMark sales are projected to be $736,000 in the coming year and $2.5 million in the second year. The EchoMark SSG catheter sales are projected at $116,000 and $768,000 in the 1st and 2nd year, respectively. *We believe these sales projections are conservative.*

Amended Complaint at ¶ 14 (quoting EchoCath Operating Model at 2) (emphasis supplied in Amended Complaint).

On 23 December 1996, Daniel Mulvena, the EchoCath Co–Chairman of the Board, ("Mulvena") told EPM representatives that anticipated investments in EchoCath would allow it to actively develop and market the products it had identified to EPM. Investments by EPM and other outside investors would provide EchoCath with sufficient operating funds for a period of at least eighteen to twenty-four months. *See* Amended Complaint at ¶ 26.

Similar statements concerning the sufficiency of such operating funds were previously made in the Prospectus, dated 17 January 1996. *See* 17 January 1996 Prospectus at 7, 23. As indicated, the 17 January 1996 Prospectus stated, in relevant part:

[EchoCath] believes that the net proceeds from the Offering, together with funds expected to be generated from operations, will be sufficient to meet its cash requirements for approximately 12 to 18 months following consummation of the Offering; **however, there can be no assurance that [EchoCath] will not require additional financing prior to that time or that, if required, additional financing will be available on acceptable terms or at all. In any event, [EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.**

*See id.* at 7 (emphasis added); *see also id.* at 23 (repeating representations).

EPM contends the efforts by EchoCath to secure an investment from EPM continued in early 1997. For instance, on 30 January 1997, DeBernardis assured Jenkins EchoCath was actively moving forward with its health products for women and that the contracts with UroHealth, J & J, Medtronic and Bard were imminent. *See* Amended Complaint at ¶ 15.

EchoCath made several other statements to EPM in an effort to solicit an investment from EPM. For example, in the EchoCath Operating Model, EchoCath stated:

Other income over the coming two-year period is in the form of license fees and Milestone payments coming from Medtronic, $450,000, .... [and] $500,000 from a company that wishes to use EchoMark technology for guiding prostate treatments.

*See* EchoCath Operating Model at 2; *see also* Amended Complaint at ¶¶ 22, 24. The EchoCath Operating Model further stated "negotiations for these contracts are in process." *See* EchoCath Operating Model at 2.

In February 1997, EPM entered into a license agreement with EchoCath pursuant to which EPM received an exclusive license with respect to certain proprietary technology developed by EchoCath relating to ultrasound guidance and imaging. *See* Amended Complaint at ¶ 6. The license included the proprietary catheter positioning system of EchoCath, needle stylet positioning system and proprietary technology for viewing tissues and organs in three-dimensional real-time. *See id.*

---

5. The EchoCath Operating Model is attached as Exhibit A to the Amended Complaint.

On 27 February 1997, EPM and EchoCath also entered into two purchase agreements (the "Purchase Agreements") whereby EPM purchased certain ultrasound piezoelectric sensors from EchoCath for use on catheters. *See* Amended Complaint at ¶ 7.

Also on 27 February 1997, EPM and Echo-Cath entered into a subscription agreement (the "Subscription Agreement") [6] pursuant to which EPM purchased 280,000 shares of preferred stock of EchoCath for $1,400,000. *See* Amended Complaint at ¶ 8.

In the Amended Complaint, EPM contends it relied on all the oral and written statements of EchoCath in deciding whether to make this investment. *See* Amended Complaint at ¶¶ 11, 16, 32. EPM does not mention whether it investigated the representations made by EchoCath or conducted due diligence prior to entering into the Subscription Agreement. *See* Amended Complaint. In this regard, the Subscription Agreement states, in relevant part:

> IV. *Representations and Warranties.* The undersigned [EPM] hereby acknowledges, represents, warrants to and agrees with [EchoCath] as follows:
>
> (a) None of the Shares are registered under the Securities Act of 1933, as amended (the "Securities Act") or any state securities laws. . . .
>
> (b) The undersigned has access to the same kind of information which would be available in registration statements filed by [EchoCath] under the Securities Act;
>
> (d) The undersigned acknowledges that prior to the date hereof it has received and reviewed a copy of [EchoCath's] annual report on Form 10–KSB. . . .
>
> (e) The undersigned acknowledges that all documents records, and books pertaining to the investment in the Shares have been made available for inspection by it, its attorney, accountant, purchaser representative or tax advisor (collectively, the "Advisors");
>
> (f) The undersigned and the Advisors have had a reasonable opportunity to ask ques-

tions of and receive answers from a person or persons acting on behalf of [EchoCath] concerning the offering of the Shares and all such questions have been answered to the full satisfaction of the undersigned and its Advisors;

> (g) In evaluating the suitability of an investment in [EchoCath], the undersigned has not relied upon any representation or other information (oral or written) other than as contained in documents or answers to questions so furnished to the undersigned or its Advisors by [EchoCath]. . . .
>
> (h) The undersigned is unaware of, and in no way relying on, any form of general solicitation or general advertising in connection with the offer and sale of the Shares;
>
> (i) The undersigned has such knowledge and experience in financial, tax, and business matters so as to enable it to utilize the information made available to it in connection with the offering of the Shares to evaluate the merits and risks of an investment in the Shares and to make an informed investment decision with respect thereto;
>
> (j) The undersigned is not relying on [EchoCath] respecting the tax and other economic considerations of an investment in the Shares, and the undersigned has relied on the advice of, or has consulted with, only its own Advisors;
>
> (*l* ) The undersigned must bear the economic risk of the investment indefinitely because none of the Shares may be sold, hypothecated or otherwise disposed of unless subsequently registered under the Act and applicable state securities laws or an exemption from registration is available. . . .
>
> (n) **The undersigned is aware that an investment in the Shares involves a number of very significant risks and is able to bear the loss of its entire investment.**

Subscription Agreement at 2 (emphasis added).

---

**6.** The Subscription Agreement is referred to in the Amended Complaint but was not attached to it. *See* Amended Complaint.

EPM alleges every representation, assurance and projection made to it by EchoCath turned out to be incorrect. *See* Amended Complaint at ¶ 25. For example, it contends EchoCath never signed a contract with Uro-Health, J & J, Medtronic, Bard or any other entity for its health products for women, contrary to the assertions by DeBernardis that EchoCath was "on the verge" of signing such contracts. *See* Amended Complaint at ¶¶ 10, 17–19. In addition, EPM asserts that, despite the sales projections of EchoCath for these products, EchoCath has yet to receive any income from the sale of these products. *See* Amended Complaint at ¶ 19. Similarly, EPM contends that, with the exception of one payment from Medtronic, EchoCath never received the $450,000 in Milestone payments it expected or the $500,000 from a company that was to use its technology to guide prostate treatments. *See* Amended Complaint at ¶¶ 22–25. Finally, EPM asserts that despite the previous representation by Mulvena regarding the sufficiency of operating funds, EchoCath informed EPM in September 1997 that EchoCath would run out of operating funds in ninety days if a new investment in the company was not forthcoming. *See* Amended Complaint at ¶ 27.

EPM alleges EchoCath knew each of its representations, assurances and projections was "false and misleading" and/or "highly unlikely." *See* Amended Complaint at ¶¶ 17–19, 21–24, 26, 29–30. In addition, EPM contends it did not know or have reason to know of the falsity of these representations. *See* Amended Complaint at ¶ 32. Furthermore, EPM alleges that, if EchoCath had disclosed to EPM the truth about its products and business, EPM would not have purchased the Securities. *See* Amended Complaint at ¶¶ 32–33.

The statements contained in the 17 January 1996 Prospectus and in other documents clash with the alleged oral misrepresentations of EchoCath. As early as 17 January 1996, EPM was placed on notice of the financial risks inherent in dealing with a development stage company which had not secured any binding commitments from third parties. *See, e.g.,* 17 January 1996 Prospectus at 7, 23 ("[EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to [EchoCath], if at all."); *id.* at 21 ("[EchoCath] is a development stage company and has not conducted any significant operations to date or received any significant operating revenues and has limited assets."); *id.* at 21 ("[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future . . . .").

The statements contained in the sales projections of EchoCath are also at odds with the alleged oral misrepresentations. The Annual Report of EchoCath on Form 10–KSB, dated 12 December 1996, (the "1996 10–K of EchoCath") stated:

> **[EchoCath's] operations have not generated significant revenues to date. [EchoCath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future. . . . No assurance can be given that [EchoCath] will successfully commercialize any of its products or achieve profitable operations.**

*See* 1996 10–K of EchoCath at 3 (emphasis added).

> **[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future** even if there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future. **There can be no assurance that [EchoCath] will ever achieve profitable operations.**

*See id.* at 19 (emphasis added).

> [EchoCath] had no significant sales revenue for the fiscal years ended August 31, 1996 and 1995.

*See id.*

> There can be no assurance that [EchoCath] will be able to complete the . . . license agreements and strategic alliances on acceptable terms. . . . **[EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath].** There can be no assurance that [Echo-

Cath] will be able to obtain financing from any other source on acceptable terms.

*See id.* at 20 (emphasis added).

Statements identical to those set out above were contained in the Form 10–Q of Echo-Cath, the quarterly report, filed 21 January 1997, (the "1997 10–Q of EchoCath"). The potentially misleading effect of any announcements issued by EchoCath prior to 21 January 1997 was neutralized by disclosures contained in the 1997 10–Q of EchoCath. The 1997 10–Q of EchoCath additionally stated:

> Research and Development expenses increased 118% during the three months ending November 30, 1996.... The quarter ending November 30, 1995 was the last quarter before the Initial Public Offering and [EchoCath] did not have the resources to match the current level of expenditure.

*See* 1997 10–Q of EchoCath at 8.

Nevertheless, EPM contends it has sustained substantial financial losses as a direct result of the alleged misrepresentations of EchoCath. *See* Amended Complaint at ¶ 34. The Amended Complaint does not indicate the nature or amount of the losses allegedly sustained by EPM. *See* Amended Complaint.

Due to these disclaimers, warnings and other statements contained in the 17 January Prospectus, the 1996 10–K of EchoCath, the EchoCath Marketing Plan, the EchoCath Operating Model, the 1997 10–Q of EchoCath and the Subscription Agreement, no reasonable investor could accept, understand or believe that an investment in EchoCath was anything but a risky, speculative investment which could well result in the loss of the entire amount invested.

*Discussion*

### A. Standard For Dismissal Under Rule 12(b)(6)

A court may dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King &*

*Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

Because granting a motion under Rule 12(b)(6) can result in a dismissal at an early stage of a case, all allegations of a plaintiff must be taken as true and all reasonable factual inferences drawn in his or her favor. *See Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Weiner,* 129 F.3d at 315; *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 279–80 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Unger,* 928 F.2d at 1395; *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir. 1986).

■ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom,* 848 F.2d at 401; *Shapiro,* 964 F.2d at 279–80. Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Haase v. Webster,* 807 F.2d 208, 215 (D.C.Cir.1986), *vacated on other grounds,* 835 F.2d 902 (D.C.Cir.1987); *Briscoe v. La-Hue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981);

*Bermingham v. Sony Corp. of Am.,* 820 F.Supp. 834, 846 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir.1994).

 A district court ' reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1420; *Bermingham,* 820 F.Supp. at 846. Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *5 (E.D.Pa. Sept.23, 1997); *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 574 (D.N.J.1996).

 Documents expressly relied upon or integral to the complaint and matters of public record, if the claims of the plaintiff are based upon such documents, may be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *In Re Westinghouse Sec. Litig.,* 90 F.3d 696, 707 (3d Cir. 1996); *In re Donald Trump Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196; *Wallace,* 1997 WL 602808, at *5; *Weiner,* 928 F.Supp. at 1380; *Gannon,* 920 F.Supp. at 574. Such documents must be explicitly relied upon or integral to the complaint. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)). The failure of a plaintiff to attach or cite documents in the complaint does not preclude a court from reviewing the texts of extrinsic documents. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426. The reason for this rule is to prevent

[t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if

the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id.* Under these circumstances, reference to documents outside of the complaint does not convert a motion to dismiss into a motion for summary judgment. *See id.; Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.

In support of the Motion to Dismiss, Echo-Cath submitted, among other things, the Subscription Agreement, the 17 January 1996 Prospectus, the 1996 10–K of EchoCath and the 1997 10–Q of EchoCath. EPM argues these documents should not be considered in connection with the Motion to Dismiss. *See* Opposition Brief at 3 n. 1, 13–16. These documents, however, are referred to in the Amended Complaint and form the basis for the allegations of EPM. *See* Amended Complaint at ¶¶ 11, 20.

 The Amended Complaint states the misrepresentations that EchoCath made to EPM about the contracts for the development and marketing of health products for women also were set forth in the 17 January 1996 Prospectus. *See* Amended Complaint at ¶ 11. Specifically, the Amended Complaint states:

The representations made by Mr. DeBernardis during the August, 1996 meeting at EchoCath were similar to the representations set forth in the Prospectus dated January 17, 1996 in connection with Echo-Cath's initial public offering of common stock through D.H. Blair Investment Banking Corp. EchoCath stated in its Prospectus that it had already developed a line of women's health products and that it intended to use the proceeds form the initial public offering to assist it in selling, marketing and manufacturing these products for sale in the United States and in parts of Europe. EP MedSystems was aware of and relied upon both the statements made at the August, 1996 meeting and in the EchoCath Prospectus in making its substantial investment in EchoCath in February, 1997.

*Id.* In light of the foregoing, the allegations by EPM are related to and based upon the 17 January 1996 Prospectus. The 17 Janu-

ary 1996 Prospectus will be considered in connection with the Motion to Dismiss. *See In re Donald Trump Sec. Litig.*, 7 F.3d at 368 n. 9 (finding district court properly considered prospectus that was not attached to complaint because complaint challenged prospectus).

■ The Amended Complaint also states that at no time prior to the purchase of the Securities by EPM did EchoCath file a 10–K (annual report) or 10–Q (quarterly report) report which revealed that it had decided not to proceed with its line of health products for women. *See* Amended Complaint at ¶ 20. Specifically, the Amended Complaint states:

Furthermore, at no time relevant hereto and prior to the February, 1997 closing did EchoCath ever file a 10–K or 10–Q report with the SEC revealing that it had changed its plan for further operation of the business including the failure to proceed with its line of women's health products.

*Id.* By this assertion, EPM appears to be alleging that EchoCath failed to correct its alleged prior misrepresentations. As well, EPM by this allegation states, albeit indirectly, that it reviewed and relied on the 10–K and 10–Q reports when it decided to purchase the Securities. The 1996 10–K of EchoCath and the 1997 10–Q of EchoCath are part of the Amended Complaint; they are relevant to the alleged misrepresentations by EchoCath. The 1996 10–K of EchoCath and the 1997 10–Q of EchoCath will be considered in connection with the Motion to Dismiss.

**7.** EPM has not challenged the authenticity of these documents. *See* Opposition Brief; *see also In re Donald Trump Sec. Litig.*, 7 F.3d at 368 n. 9 ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

**8.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive de-

■ Finally, the basis for the claims by EPM is that the misrepresentations by Echo-Cath induced it to enter into the Subscription Agreement. *See* Amended Complaint at ¶ 32 ("[EPM] reasonably relied upon the ... misrepresentations and omissions by EchoCath in making its decision to purchase the securities of EchoCath."). The Subscription Agreement is therefore relevant to the claims by EPM even though EPM does not allege that the Subscription Agreement itself contains misrepresentations and did not attach it to the Amended Complaint. In addition, the contents of the Subscription Agreement are relevant to ascertain whether the facts alleged in the Amended Complaint will support the claims of EPM. *See Ransom*, 848 F.2d at 401. As such, the contents of the Subscription Agreement will be considered in connection with the Motion to Dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.[7]

**1.** *The Claim of EPM for Securities Fraud*

■ EPM asserts claims for violations by EchoCath of Section 10(b) [8] and Rule 10b–5.[9] In order to establish such a claim, a plaintiff must prove EchoCath (1) made misstatements or omissions of material fact (2) with scienter (3) in connection with the purchase or sale of securities (4) upon which the plaintiff relied and (5) that the reliance of the plaintiff was the proximate cause of its injury. *See Weiner*, 129 F.3d at 315 (quoting *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 487 (3d Cir.), *cert. denied*, 513 U.S. 1032,

vice or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. § 78j(b).

**9.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....
17 C.F.R. § 240.10b–5.

115 S.Ct. 613, 130 L.Ed.2d 522 (1994)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417; *Shapiro*, 964 F.2d at 280. If a plaintiff fails to allege any of these elements, the complaint must be dismissed. *See In re Donald Trump Sec. Litig.*, 7 F.3d at 368 n. 10 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380–86, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)); *In re Westinghouse Sec. Litig.*, 90 F.3d at 710; *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991); *Wallace*, 1997 WL 602808, at *8.

■ Because a Rule 10b–5 claim is a "fraud" claim, EPM must satisfy the pleading requirements of Rule 9(b). *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417; *In Re Westinghouse Sec. Litig.*, 90 F.3d at 710; *Wallace*, 1997 WL 602808, at *8. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The heightened pleading gives defendants "notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418.

■ In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, EPM must plead with particularity (1) a specific misrepresentation of material fact, (2) the knowledge by EchoCath of its falsity, (3) ignorance of its falsity, (4) the intention of EchoCath that it should be acted upon and (5) that EPM acted upon it to the detriment of EPM. *See In Re Westinghouse Sec. Litig.*, 90 F.3d at 710; *Shapiro*, 964 F.2d at 284.

■ Consequently, Rule 9(b) demands increased specificity in the pleadings to establish violations of Section 10(b) and Rule 10b–5.[10] Pursuant to Rule 9(b), allegations concerning misrepresentations of material fact must be pleaded in greater detail. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417–18 (Rule 9(b) requires "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, ... plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data"); *Shapiro*, 964 F.2d at 285

**10.** The Private Securities Litigation Reform Act of 1995, (the "Reform Act"), 15 U.S.C. §§ 78u–4(b), 78u–5(c) and 78u–5(i)(1), discussed in greater detail in connection with the individual requirements under Rule 10b–5, adopts this heightened pleading requirement for all private securities litigation. *See* 15 U.S.C. § 78u–4(b)(1)(B) ("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."). The pleading requirements under the Reform Act place an "additional burden on plaintiffs attempting to plead fraud in securities cases." *Rosenbaum & Co. v. H.J. Myers & Co.*, No. 97–824, 1997 WL 689288, at *2 (E.D.Pa. Oct.9, 1997).

The Reform Act was enacted in December 1995 in an effort by Congress to curtail perceived abuses in private securities litigation.

Congress has been prompted ... to enact reforms to protect investors and maintain confidence in our capital markets. The House and Senate Committees heard evidence that abusive practices committed in private securities litigation include: (1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability....

*See* H.R.Conf.Rep. No. 104–369, 104th Cong., 1st Sess. 31, 32 (1995) (the "Conference Report"). The Reform Act applies to all actions commenced after the date of enactment, 22 December 1995. *See* Conference Report at 23. EPM filed the Complaint on 7 October 1997; the Reform Act therefore applies to this action.

The Reform Act is not limited to class actions. *See DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 985 F.Supp. 427, 430–31 (S.D.N.Y. 1997) (observing "there is nothing in the legislative history which indicates that the [Reform Act] was intended to be limited to 'class actions' "); *Rosenbaum*, 1997 WL 689288; *Medical Imaging Centers of Am., Inc. v. Lichtenstein*, 917 F.Supp. 717, 719–21 (S.D.Cal.1996); *see also* 15 U.S.C. § 78u–4(b) (omitting express limitation of provisions to class action suits, in contrast to 15 U.S.C. § 78u–4(a)).

Together, Rule 9(b) and 15 U.S.C. § 78u–4(b) require a plaintiff to state with particularity the circumstances surrounding the alleged fraud.

(citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir.1989)) (Rule 9(b) requires plaintiffs to "accompany the allegations with a statement of fact upon which their allegation is based").

A viable claim under Section 10(b) and Rule 10b–5 also requires a plaintiff to plead scienter. Rule 9(b), however, states "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See* F.R.Civ.P. 9(b). This Circuit has interpreted this provision to mean that

> [w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with "scienter." Otherwise, strike suits based on no more than plaintiffs' detection of a few negligently made errors in company documents or statements (errors detected in the aftermath of a stock price drop) could survive the pleading threshold and subject public companies to unneeded litigation expenditures.

*See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see also In re Westinghouse Sec. Litig.*, 90 F.3d at 711.[11]

The particularity requirement of Rule 9(b) is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285; *Craftmatic Sec. Litig.*, 890 F.2d at 645. This is so because application of the particularity requirement "may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see Craftmatic*, 890 F.2d at 645; *Christidis v. First Pa. Mort. Trust*, 717 F.2d 96, 100 (3d Cir.1983).

■■■ Even under a relaxed application of Rule 9(b), "boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see Shapiro*, 964 F.2d at 285. In accordance with Rule 9(b), a plaintiff must still plead

with particularity his or her ignorance of the falsity of the misrepresentation. In this connection, a complaint alleging violations of Section 10(b) and Rule 10b–5 must contain more than mere conclusory allegations that the necessary information lies within the exclusive control of the defendants. *See Shapiro*, 964 F.2d at 285. Instead, a complaint must set forth "at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." *Id.; see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418 ("Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."); *Craftmatic*, 890 F.2d at 645. This pleading requirement promotes due diligence by requiring a plaintiff to

> thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint.

*Shapiro*, 964 F.2d at 285.

■■■ In the Opposition Brief, EPM contends the particularity requirement of Rule 9(b) should be relaxed in this case because the precise information known by the managers of EchoCath when they made the alleged misrepresentations to EPM is exclusively within the control of EchoCath. *See* Opposition Brief at 14–15. EPM asserts that it can obtain this information only through discovery and therefore the Motion to Dismiss should be denied. *See id.* No such allegation was set forth in the Amended Complaint. *See* Amended Complaint.

Before EPM filed the Amended Complaint, EPM was required to delineate, at the very least, the nature and scope of its effort to obtain the information needed to plead with particularity. *See Shapiro*, 964 F.2d at 285; *see Weiner*, 129 F.3d at 319. Neither the Amended Complaint nor the Opposition Brief sets forth the nature and scope of the efforts by EPM to obtain the information it contends it needed to plead its allegations with

---

**11.** As discussed below, a plaintiff who commences an action for securities fraud after the enactment date of the Reform Act must also satisfy the heightened pleading standard for scienter. The Reform Act provides, in relevant

part, "[t]he complaint shall with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

particularity. *See* Amended Complaint; Opposition Brief. It is unclear what efforts, if any, EPM undertook before filing the Complaint and the Amended Complaint. The Motion to Dismiss can not be denied simply because EPM alleges in conclusory fashion in the Opposition Brief that it did not have sufficient information with which to plead its allegations with specificity. *See Shapiro*, 964 F.2d at 285; *see also* 15 U.S.C. § 78u–4(b)(1)(B).

As discussed below, the Amended Complaint contains boilerplate and conclusory allegations of securities "fraud by hindsight." The Amended Complaint does not contain sufficient particularity with which to satisfy the heightened pleading standards of Rule 9(b) or the Reform Act. Even under a relaxed application of Rule 9(b), the Amended Complaint must be dismissed. In addition, as explained below, the Amended Complaint must be dismissed pursuant to Rule 12(b)(6) because EPM has not satisfied the requirements for sustaining a Rule 10b–5 claim.

### a. *Misrepresentations or Omissions of Material Fact*

"A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *Wallace*, 1997 WL 602808, at *9; *see In re Bell Atlantic Corp. Sec. Lit.*, No. 91–0514, 1997 WL 205709, at *23 (E.D.Pa. Apr.17, 1997); *Pache v. Wallace*, No. 93–5164, 1995 WL 118457, at *3 (E.D.Pa. Mar.20, 1995), *aff'd*, 72 F.3d 123 (3d Cir.1995).

■ Misleading statements of intentions or forward looking statements, such as projections, estimates, and forecasts may be actionable if "[they] are issued without reasonable genuine belief [in their accuracy or truth] or if [they] ha[ve] no basis." *Kline*, 24 F.3d at 486; *see also In re Donald Trump Sec. Litig.*, 7 F.3d at 368; *In re Bell Atlantic Corp. Sec. Lit.*, 1997 WL 205709, at *23.

■ In order to determine whether a forward looking statement can be deemed false or misleading, "the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief." *In re Bell Atlantic Corp. Sec. Lit.*, 1997 WL 205709, at *23; *see Kline*, 24 F.3d at 486. It is not enough, however, that a statement is false or misleading; if the misrepresented fact is not material, then the misrepresented fact is not actionable. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Weiner*, 928 F.Supp. at 1384.

■ A misleading statement is material if there is a substantial likelihood that the reasonable investor would have viewed the statement or omission "as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231, 108 S.Ct. 978; *see Weiner*, 129 F.3d at 317; *Shapiro*, 964 F.2d at 281 n. 11; *Wallace*, 1997 WL 602808, at *9. "The Supreme Court has been 'careful not to set too low a standard of materiality' in order to avoid 'an overabundance of information' especially concerning corporate developments of 'dubious significance.' " *Weiner*, 928 F.Supp. at 1384 (quoting *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991)); *see Basic*, 485 U.S. at 231, 108 S.Ct. 978. The reason for this is that the Supreme Court

> was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.'

*Basic*, 485 U.S. at 231, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ The issue of materiality is a mixed question of law and fact which ordinarily is decided by the trier of fact. *See Weiner*, 129 F.3d at 317; *In re Donald Trump Sec. Litig.*, 7 F.3d at 369 n. 13; *Shapiro*, 964 F.2d at 281 n. 11. However, if the alleged misrepresentations and omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the allegations are not actionable as a matter of law. *See Weiner*, 129 F.3d at 317; *In re Westinghouse Sec. Litig.*, 90 F.3d at 707 n. 8; *In re Donald Trump Sec. Litig.*, 7 F.3d at 369 n. 13; *Sha-*

*piro,* 964 F.2d at 281 n. 11. When assessing materiality, not only the statement or omission itself but, as well, the context in which it occurs must be considered. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 364 ("[A] statement or omission must be considered in context."); *Wallace,* 1997 WL 602808, at *9.

In the Opposition Brief, EPM contends the following material misrepresentations were made by EchoCath to induce it to purchase the Securities. First, in August 1996 and again in late January 1997, EchoCath orally stated to EPM that it was "on the verge of signing contracts" with third parties for its health products for women even though EchoCath knew it had no reasonable prospects of entering into any contract relating to these products. (Hereinafter referred to as the "Possible Contracts Allegation"). *See* Opposition Brief at 19 (quoting Amended Complaint at ¶¶ 10, 15, 17–19).

Second, on 20 December 1996, EchoCath delivered to EPM sales projections for its health products for women showing rapid sales growth in 1997 and 1998 when in fact EchoCath "did not genuinely believe and had no reasonable basis to support the projections." (Hereinafter referred to as the "Sales Projections Allegation"). *See id.* (quoting Amended Complaint at ¶¶ 13–14, 18).

Third, in the EchoCath Operating Model, dated 20 December 1996, EchoCath represented to EPM that it would receive income in the form of license fees and Milestone payments from Medtronic in the amount of $450,000 even though "EchoCath had no reasonable basis to support this projection and knew ... it was false and misleading." (Hereinafter referred to as the "Medtronic Allegation"). *See id.* (quoting Amended Complaint at ¶¶ 21–23).

Fourth, also in the EchoCath Operating Model, dated 20 December 1996, EchoCath advised EPM that it "anticipated receiving" income in the amount of $500,000 from a company that would use EchoMark technology for guiding prostate treatments when EchoCath "had no reasonable basis to support this statement and knew that it was highly questionable, if not entirely unlikely, this contract would ever be consummated."

(Hereinafter referred to as the "Prostate Contract Allegation"). *See id.* at 20 (quoting Amended Complaint at ¶ 24).

Fifth, on or about 23 December 1996, EchoCath orally informed EPM that the anticipated investment by EPM together with other outside investments "would provide sufficient operating funds to allow EchoCath to actively develop and market the products ... for a period of at least 18 to 24 months" when in fact EchoCath "knew or had every reason to know this representation was false." (Hereinafter referred to as the "Cash Balance Allegation"). *See id.* (quoting Amended Complaint at ¶¶ 26–27).

EchoCath contends EPM has failed to demonstrate how the Possible Contracts Allegation, the Sales Projections Allegation, the Medtronic Allegation, the Prostate Contract Allegation and the Cash Balance Allegation, (collectively, the "Alleged Misrepresentations") constitute material misrepresentations. *See* Moving Brief at 23–31. The 17 January 1996 Prospectus, the 1996 10–K of EchoCath, the 1997 10–Q of EchoCath and the Subscription Agreement all include general warnings that an investment in Echo-Cath was risky, indeed speculative. These documents include specific language detailing a variety of risk factors that pointed out the uncertain nature of the EchoCath operation and the fact that the success and profitability of EchoCath were uncertain at best. Within these broad, yet detailed warnings, the Alleged Misrepresentations at issue were, at worst, harmless. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 371. Each of these allegations is addressed.

### (1) *Possible Contracts Allegation and Sales Projections Allegation*

The Possible Contracts Allegation is based upon representations made by DeBernardis on two occasions between August 1996 and late January 1997. Specifically, EPM alleges DeBernardis falsely stated EchoCath was "on the verge" of signing contracts for its women's health products with UroHealth, Johnson & Johnson, Medtronic and Bard. *See* Amended Complaint at ¶¶ 10, 15. According to the Amended Complaint, Echo-

Cath assured EPM that such contracts with outside companies were "imminent." *See id.* at ¶ 15. EPM contends EchoCath "had no reasonable prospects of entering into the contracts." *See id.* at ¶ 18.

As indicated, in assessing materiality, the context in which the alleged misrepresentation was made must be examined. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 364. Statements contained in offering documents are relevant to this issue. *See id.* at 371. This Circuit has followed the lead of several Courts of Appeals which dismissed securities fraud claims under Rule 12(b)(6) because "cautionary language in the offering document negated materiality of an alleged misrepresentation or omission." *See id.*

Notably, EPM expressly acknowledges the Possible Contracts Allegation contains representations "similar to the representations set forth in the Prospectus, dated January 17, 1996.... EchoCath stated in its Prospectus that it had already developed a line of women's health care products." Amended Complaint at ¶ 11. However, the written statements contained in the 17 January 1996 Prospectus, which predated the Possible Contracts Allegations of August 1996 and January 1997, contradict these later oral representations of DeBernardis, rendering them immaterial. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 364.

The 17 January 1996 Prospectus refrained from stating EchoCath had already reached agreements with outside parties or had received funds pursuant to such agreements to market or develop any of its products, including its women's healthcare products. Instead, the 17 January 1996 Prospectus stated:

> [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to [Echo-Cath], if at all.

17 January 1996 Prospectus at 7; *see id.* at 23.

> [EchoCath] intends to pursue licensing, joint development and other collaborative arrangements with other strategic partners. There can be no assurance, however, that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies.

17 January 1996 Prospectus at 8; *see id.* at 24.

> [EchoCath] has not yet developed a sales organization to market and sell any of its products and there can be no assurance that [EchoCath] will be successful in establishing a sales organization or as to the effectiveness of such sales organization. [EchoCath] also intends to rely upon a network of distributors or enter into joint venture, licensing, or other collaborative arrangements to market and sell its products.... There can be no assurance that [EchoCath] will be successful in entering into any such arrangements or be able to effectively manage and maintain its relationships with others, or that any marketing and sales efforts undertaken by or on behalf of [EchoCath] will be successful.

17 January 1996 Prospectus at 9.

> [EchoCath] currently does not have written agreements with any of its suppliers for manufacture or assembly.

17 January 1996 Prospectus at 31.

With specific reference to the women's health care products "EchoMark" and "ColorMark," the 17 January 1996 Prospectus stated:

> Such products ... are expected to require additional financing to commercialize. There can be no assurance as to [Echo-Cath's] ability to ... secure any financing.

*Id.* at 25; *see id.* at 26.

Similarly, the 1997 10–Q of EchoCath, filed on 21 January 1997, just prior to the 30 January 1997 statement by DeBernardis, reiterated "[t]here can be no assurances that [EchoCath] will be able to complete the ... license agreements and strategic alliances on acceptable terms.... [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath]." *See* 1997 10–Q of EchoCath at 8. Significantly, there is a common theme which is first memorialized in the 17 January 1996 Prospectus and is

carried forward in the 1997 10–Q of Echo-Cath, filed on 21 January 1997. Each of these documents stresses the highly speculative nature of the investment and the fact that EchoCath was merely a start-up company *hoping* for success.

Absent a statement by EchoCath that the contracts would be consummated, such statements, taken in context, are not false and misleading. *See Weiner,* 129 F.3d at 317. The contradictory language contained in the 17 January 1996 Prospectus put EPM on notice of the possibility such contracts would not be consummated, thereby diminishing the importance of the oral statements. *See Associates in Adolescent Psych. v. S.C. Home Life Ins. Co.,* 941 F.2d 561, 571 (7th Cir.1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). EPM, a sophisticated investor, can not argue that such oral statements significantly altered the "total mix" of information made available to EPM. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 370 (alleged misrepresentation deemed immaterial where prospectus contains abundance of warnings and the alleged misrepresentation was buried amidst cautionary language)

The Sales Projections Allegation is based upon sales projections for the women's health products contained in the EchoCath Marketing Plan. Delivered to EPM on 20 December 1996 with the EchoCath Operating Model, the EchoCath Marketing Plan stated:

> 'ColorMark sales are projected to be $736,-000 in [1997] and $2.5 million in [1998]. The EchoMark SSG catheter sales are projected at $116,000 and $786,000, in the 1st and 2nd year, respectively. We believe these sales projections are conservative.'

*See* Amended Complaint at ¶ 14 (quoting the EchoCath Marketing Plan). EPM alleges EchoCath "did not genuinely believe and had no reasonable basis to support the projections set forth in the [EchoCath Marketing Plan]." *See* Amended Complaint at ¶ 18.

The statements contained in the EchoCath Marketing Plan, the 17 January 1996 Prospectus, the 1996 10–K of EchoCath, dated 12 December 1996, the 1997 10–Q of Echo-Cath, filed 21 January 1997, and the Sub-scription Agreement reveal that the data upon which the Sales Projections Allegation is based are neither misleading nor material. The EchoCath Marketing Plan stated "[t]his plan will *outline* the sales and *marketing goals* for the next two years (February 1996 — January 1998). *It is intended as a beginning guide, and it is expected that it will be revised."* *See* EchoCath Marketing Plan at 1 (emphasis added).

As discussed in further detail in connection with the reasonable reliance requirement of Rule 10b–5, the 17 January 1996 Prospectus emphasized:

> [EchoCath] is a development stage company which has limited sales and which has incurred substantial losses since inception. An investment in the securities offered hereby is speculative in nature and involves a high degree of risk.

17 January 1996 Prospectus at 5.

> [EchoCath] is a development stage company and has not conducted any significant operations to date or received any significant operating revenues and has limited assets.

*Id.* at 21.

> [EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future. There can be no assurance that [EchoCath] will ever achieve profitable operations.

*Id.*

> [EchoCath's] operations have not generated significant revenues to date. [Echo-Cath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future.

*Id.* at 24.

> Among the factors cited by the auditors as raising substantial doubt as to [Echo-Cath's] ability to continue as a going concern is that [EchoCath] has incurred losses since inception and is expected to continue to incur losses and is in need of substantial

funds. There can be no assurance that [EchoCath] will ever achieve significant revenues or profitable operations.

*Id.* at 7.

[EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.

*Id.; see id.* at 23.

The 1996 10–K of EchoCath, dated 12 December 1996, stated that since its inception, EchoCath "has sustained cumulative losses of approximately $(11,395,000) through August 31, 1996." See 1996 10–K of EchoCath at 19. The 1996 10–K of EchoCath further indicated that in fiscal year 1996, EchoCath suffered $2,921,575 in operating losses, on only $108,025 in revenues. *See* 1996 10–K of EchoCath at 19–20. The 1997 10–Q of EchoCath, filed 21 January 1997, stated that "[f]ollowing December 31, 1997, [EchoCath] may well need substantial additional financing in order to continue development of and commercialize certain of its proposed products and other potential products." *See* 1997 10–Q of Echo-Cath at 8.

These statements contained in the several documents from EchoCath place the isolated sales projections in the EchoCath Marketing Plan in context, rendering them immaterial. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 370.

 In the Subscription Agreement, EPM acknowledged that in making its investment decision, it "has relied on the advice of, or has consulted with, *only its own Advisors. See* Subscription Agreement at 2 (emphasis added). In disclaiming reliance on the advice of EchoCath in purchasing the Securities, EPM implicitly concedes the statements forming the basis of the Possible Contracts Allegation and Sales Projections Allegation could not have significantly altered the 'total mix' of information made available." *See Basic,* 485 U.S. at 231, 108 S.Ct. 978; *Weiner,* 129 F.3d at 317; *Shapiro,* 964 F.2d at 281 n. 11; *Wallace,* 1997 WL 602808, at *9.

(2) *Medtronic Allegation and Prostate Contract Allegation*

 In the Amended Complaint, EPM alleges the EchoCath Operating Model, dated 20 December 1996, indicates that Echo-Cath anticipated Milestone payments of $450,000 in connection with a contract with Medtronic. *See* Amended Complaint at ¶ 22; *see also* EchoCath Operating Model at 2. In addition, EPM alleges the EchoCath Operating Model indicates that EchoCath anticipated income of $500,000 from an unnamed company in connection with the use of EchoMark technology. *See* Amended Complaint at ¶ 24; *see also* EchoCath Operating Model at 2.

EPM contends EchoCath has received no more than one projected payment from Medtronic under the terms of a contract. *See* Amended Complaint at ¶ 24. In addition, EPM contends EchoCath has not entered into a contract regarding the use of the EchoMark technology and has never received a payment in connection with it. *See* Amended Complaint at ¶ 24. EPM argues the representations by EchoCath in the EchoCath Operating Model that certain contracts were "imminent" and that EchoCath would receive certain income from these contracts amounted to material misrepresentations. *See* Amended Complaint at ¶ 29.

A review of the EchoCath Operating Model, however, reveals EchoCath did not guarantee that it would receive the income mentioned. The EchoCath Operating Model stated, in relevant part:

Other income over the [period from November 1996 to October 1998] is in the form of license fees and Milestone payments coming from Medtronic, $450,000, ... [and] $500,000 from a company that wishes to use EchoMark technology for guiding prostate treatments.

*See* EchoCath Operating Model at 2. The surrounding language in the EchoCath Operating Model, of which EPM omits mention, negates the materiality of these statements.

*This Model is driven by a number of assumptions:* these include the Product Sales projections on page 2, the License and Grant Income on page 1, future Expenses as shown on page 3, and a 60 day assumption for inventory and receivables on the Balance Sheet, page 5. (It should be noted that it is assumed that we can work

down the present inventory, which reflects "gearing up" prior to sale and so is larger than 60 days.)

*See* EchoCath Operating Model at 2 (emphasis added). Contrary to the contentions of EPM, the EchoCath Operating Model did not contain any representations as to the likelihood that EchoCath would obtain any income from these sources. *See* EchoCath Operating Model at 2. In fact, EchoCath did not state that the contracts had been consummated. *See* EchoCath Operating Model. Instead, the EchoCath Operating Model expressly stated: "[n]egotiations for these contracts are in process." *See* EchoCath Operating Model at 2.

The statements by EchoCath cannot be considered misrepresentations, let alone material misrepresentations, because EchoCath merely advised that it anticipated entering into certain contracts with third parties and anticipated that it could earn a certain amount of income in connection with these anticipated contracts.

Disclosures contained in documents issued prior to the date of the EchoCath Operating Model put EPM on inquiry notice that consummation of contracts with third parties and income flowing therefrom were not guaranteed. *See, e.g.,* 17 January 1996 Prospectus at 7 ("[EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to ([EchoCath], if at all."); 1996 10–K of Echo-Cath at 20 ("There can be no assurance that [EchoCath] will be able to complete the . . . license agreements and strategic alliances on acceptable terms . . . . [EchoCath] has no binding agreements from any third parties to provide funds to [EchoCath]. There can be no assurance that [EchoCath] will be able to obtain financing from any other source on acceptable terms.") The 1997 10–Q of Echo-Cath, filed on 21 January 1997, and made available to EPM soon after it received the EchoCath Operating Model, repeated these disclaimers. *See* 1997 10–Q of EchoCath at 8.

The statements by EchoCath in the Echo-Cath Operating Model were driven by "a number of assumptions." *See* EchoCath Operating Model. As discussed, the statements in the EchoCath Operating Model which comprise the Medtronic Allegation and the Prostate Contract Allegation did not guarantee the receipt of income from these contracts, much less predict the likelihood that such income would be obtained. Instead, these statements were merely expressions of anticipation.

In light of the written disclaimers issued before and after the issuance of the Echo-Cath Operating Model, such expressions of anticipation do not significantly alter the "total mix" of information made available to EPM. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 364; *Weiner,* 129 F.3d at 317. As such, the statements in the EchoCath Operating Model do not constitute material misrepresentations. *See Basic,* 485 U.S. at 231, 108 S.Ct. 978; *Weiner,* 129 F.3d at 317; *Shapiro,* 964 F.2d at 281 n. 11; *Wallace,* 1997 WL 602808, at *9.

### (3) *Cash Balance Allegation*

■ EPM asserts EchoCath told it on or about 23 December 1996 that the investment by EPM, together with "other outside investments in [EchoCath] would provide sufficient operating funds to allow EchoCath to actively develop and market the products . . . for a period of at least 18 to 24 months." *See* Amended Complaint at ¶ 26. EPM alleges that in September 1997, EchoCath announced it would run out of operating funds if a new investment was not forthcoming. *See id.* at ¶ 27. EPM then concludes that the statement by EchoCath in December 1996 was knowingly false when made "in light of the inflated and misleading projections and other representations EchoCath had made to [EPM]." *See id.* at ¶ 26.

EPM acknowledges EchoCath advised it on 23 December 1996 that it needed "other outside investments" beyond that provided by EPM. *See id.* EPM further acknowledges EchoCath informed it on 23 December 1996 that investments in EchoCath were "anticipated"—not guaranteed. *See id.* The statement by EchoCath in September 1997 that it still needed additional nvestment

merely reiterated what EchoCath told EPM in December 1996.

The Cash Balance Allegation is not material because there is not a substantial likelihood that a reasonable investor would have viewed the statements by EchoCath "as having significantly altered the 'total mix' of information made available.'" *See Basic,* 485 U.S. at 231, 108 S.Ct. 978; *see Weiner,* 129 F.3d at 317; *Shapiro,* 964 F.2d at 281 n. 11; *Wallace,* 1997 WL 602808, at *9. As discussed in more detail in connection with the reasonable reliance requirement of Rule 10b–5, consideration of the express, specific warnings in the documents that were filed by EchoCath with the SEC preclude a finding of materiality.

Specifically, in the 17 January 1996 Prospectus, EchoCath expressed the belief "that the net proceeds from the Offering, together with funds expected to be generated from operations, will be sufficient to meet its cash requirements for approximately 12 to 18 months following consummation of the Offering." *See* 17 January 1996 Prospectus at 7 & 23. The time period stated in the 17 January 1996 Prospectus is not identical to that alleged in the Amended Complaint; however, the Amended Complaint does not define the dates encompassed by the 18–24 months. *See* Amended Complaint at ¶ 26. It appears the time periods overlap to some extent.

The statement in the 17 January 1996 Prospectus addressed the time period from January 1996 to December 1996, or perhaps to *June 1997.* The announcement by EchoCath in *September 1997* that it required additional funds is not inconsistent with its previous representation in the 17 January 1996 Prospectus. *See* 17 January 1996 Prospectus at 7 & 23. According to the 17 January 1996 Prospectus, the period in which operating funds would be sufficient expired, at the latest, in June 1997.

Immediately following the statement in the 17 January 1996 Prospectus concerning the sufficiency of operating funds, the Prospectus cautioned: *"there can be no assurance that [EchoCath] will not require additional financing prior to that time or that, if required, additional financing will be available on acceptable terms or at all." See* 17 January 1996 Prospectus at 7 (emphasis added). The 17 January 1996 Prospectus continued:

> [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to [Echo-Cath], if at all. Failure to obtain such additional financing would have a material adverse effect on [EchoCath's] business and prospects and could require [Echo-Cath] to severely limit or cease its operations.

*See* 17 January 1996 Prospectus at 7.

> [EchoCath] may be required to seek additional financing during such period in the event of delays, lack of market acceptance, cost overruns, delays in obtaining regulatory approvals or unanticipated expenses associated with a company in an early stage of development.

*See id.* at 23.

> [EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.

*See id.* at 7; *see also* 1996 10–K of EchoCath at 19 ("[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products...").

This language, specifically tailored to address the Cash Balance Allegation, effectively communicated the uncertainty of Echo-Cath in obtaining additional financing in the form of "other outside investments." The Cash Balance Allegation, when examined in light of the surrounding language in the 17 January 1996 Prospectus, is neither misleading nor material. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 371 (challenged statement in prospectus was "at worst, harmless" because "an investor would have read the [cautionary] sentence immediately following the challenged statement").

### b. *Scienter*

EchoCath contends EPM also failed to plead in the Amended Complaint sufficient facts which give rise to an inference that

EchoCath acted with fraudulent intent when it made the Alleged Misrepresentations. *See* Moving Brief at 15.

Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R.Civ.P. 9(b). "[A]lthough state of mind may be 'averred generally,' a plaintiff alleging securities fraud must still allege specific facts that give rise to a 'strong inference' that EchoCath possessed the requisite intent." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418 (citing and adopting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995)); *see Wallace,* 1997 WL 602808, at *16. "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418.

The pleading standard for scienter under the Reform Act also is relevant to this analysis. In formulating a heightened pleading standard for scienter for claims under Section 10(b) and Rule 10b–5, Congress recognized that Rule 9(b) "has not prevented abuse of the security laws by private litigants" in part because "the courts of appeal have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards [for scienter] among the circuits." *See* Conference Report at 41. Congress envisioned a more uniform pleading standard

which would "curtail the filing of meritless lawsuits." *See id.*

The Reform Act added § 21D, 15 U.S.C. § 78u–4, ("Section 21D") to the Securities Exchange Act of 1934 (the "Exchange Act"). Section 21D(b)(2) provides, in relevant part:

> [T]he complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*See* 15 U.S.C. § 78u–4(b)(2) (emphasis added).[12]

 In light of the heightened pleading requirements under the Reform Act and Rule 9(b), a plaintiff may not simply point to a bad result and allege fraud. Rather, a plaintiff must demonstrate how the earlier statements were misleading at the time they were made. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547–48 n. 7 and 1549 (9th Cir.1994); *Wallace,* 1997 WL 602808, at *16; *Sun Co., Inc. v. Badger Design & Constructors,* 939 F.Supp. 365, 369 (E.D.Pa. 1996); *In re Chambers Dev. Sec. Litig.,* 848 F.Supp. 602, 616 (W.D.Pa.1994).

EPM has not pleaded with any factual specificity a "strong inference" of fraudulent intent, as required by Section 21D(b)(2), and Rule 9(b), as interpreted in this Circuit. EPM expressly declined to allege intentional conduct on the part of EchoCath, much less motive and opportunity to commit fraud.

---

12. Whether Section 21D(b)(2) is an endorsement or an abrogation of the pleading standard for scienter in Second Circuit, which standard was explicitly adopted in this Circuit, *see In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418, is the subject of much debate. Several courts which have addressed this issue have held that Congress did not intend to invalidate the "motive and opportunity" test of the Second Circuit. *See In re Health Management Inc. Sec. Litig.,* 970 F.Supp. 192 (E.D.N.Y.1997); *Zeid v. Kimberley,* 930 F.Supp. 431 (N.D.Cal.1996); *Marksman Partners L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1308–1311 (C.D.Cal.1996).

Several district courts have declined to adopt this view, however, holding that the "motive and opportunity" prong of the Second Circuit's test for scienter is no longer viable under the Reform Act. *See In re Glenayre Tech., Inc. Sec. Litig.,* 982 F.Supp. 294 (S.D.N.Y.1997); *In re Baesa Sec.*

*Litig.,* 969 F.Supp. 238 (S.D.N.Y.1997); *Norwood Venture Corp. v. Converse, Inc.,* 959 F.Supp. 205 (S.D.N.Y.1997); *Friedberg v. Discreet Logic, Inc.,* 959 F.Supp. 42 (D.Mass.1997); *In re Silicon Graphics Inc. Sec. Litig.,* 1996 WL 664639 (N.D.Cal. Sept.25, 1996) (Silicon I). According to this line of authority, the Reform Act embraces an even stricter pleading standard than that of the Second Circuit. Under the revised pleading standard of the Reform Act, a plaintiff must allege circumstantial evidence of conscious misbehavior on the part of a defendant to avoid dismissal of the complaint.

It is presently unnecessary to determine whether Section 21D(b)(2) codifies the pleading standards for scienter of the Second Circuit. In the instant case, EPM has failed to sufficiently plead motive and opportunity, much more circumstantial evidence of intentional conduct.

*See* Amended Complaint; Opposition Brief at 16–17.

■ EPM argues, nevertheless, the Amended Complaint satisfies the scienter requirement because it alleges facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness on the part of EchoCath. *See* Opposition Brief at 16–18. Specifically, EPM argues EchoCath was wrong about each of its representations to EPM and therefore asserts EchoCath "could not have been *so wrong so often* about *so many* critical facts," absent a fraudulent intent. *See* Opposition Brief at 20 (emphasis in original). EPM contends that when the allegations of misrepresentation are viewed together, they constitute "circumstantial evidence of reckless or conscious misbehavior" on the part of EchoCath which is sufficient to satisfy the scienter pleading requirement. *See* Opposition Brief at 21.

The argument by EPM that the allegations should be analyzed together rather than individually has been rejected by the Circuit. In *In re Westinghouse,* the Circuit stated:

Plaintiffs argue that the district court, by 'compartmentalizing the evidence and wiping the slate clean after considering each component,' failed to give weight to the 'totality of the pleadings.' ... We have instructed that the district courts should engage in precisely the sort of analysis undertaken by the district court in this case.

90 F.3d at 712. Accordingly, each allegation of fraud asserted by EPM must be considered separately. *See Shapiro,* 964 F.2d at 284 (directing plaintiff to amend complaint and stating "plaintiff should rearrange the existing allegations into discrete units that are, standing alone, each capable of evaluation under the [relevant] legal principles.").

(1) *Possible Contracts Allegation and Sales Projections Allegation*

■ As foundation for the Possible Contracts Allegation, EPM contends EchoCath knew that it had no reasonable prospects of entering into contracts with, among others, J & J and UroHealth to market and commercialize its women's healthcare products. *See* Amended Complaint at ¶ 18. EPM offers no explanation for this assertion, other than to assert that EchoCath ultimately did not succeed in consummating the contracts.

Similarly, in support of the Sales Projections Allegation, EPM alleges that in December 1996 EchoCath provided it with sales projections for health products for women which EchoCath knew at the time lacked a reasonable financial basis. *See* Amended Complaint at ¶¶ 14–18. Nowhere in the Amended Complaint, however, does EPM offer a factual explanation for its assertion that these projections lacked a reasonable basis, or that EchoCath knew that they did.

In *In re Burlington Coat Factory Securities Litigation,* the Circuit affirmed the dismissal of the Section 10(b) and Rule 10b–5 claims of the plaintiff which were based on forecasts and projections of future earnings. In that case, the plaintiff asserted in conclusory fashion that there "was no reasonable basis" for those projections. The Circuit stated:

[I]t is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis. Instead, plaintiffs bear the burden of 'pleading factual allegations, not hypotheticals, sufficient to reasonably allow the inference that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.

114 F.3d at 1429–30. In this case, EPM has failed to plead with any particularity the strong inference of scienter required to support the Possible Contracts Allegation or the Sales Projections Allegation. Specifically, EPM has not pleaded facts which indicate the representation by EchoCath that it would enter contracts with certain third parties was made with inadequate consideration of the available data. EPM also has not offered factual allegations sufficient to allow the inference that the projections were made with an inadequate consideration of the available data or through the use of unsound forecasting methodology.

The 17 January 1996 Prospectus and the EchoCath Marketing Plan, moreover, contain

754

express disclosures which eviscerate any inference that EchoCath possessed the requisite intent to commit fraud. For example, with respect to the Possible Contracts Allegation, EchoCath explicitly warned EPM:

[EchoCath] intends to pursue licensing, joint development and other collaborative arrangements with other strategic partners. There can be no assurance, however, that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies.

17 January 1996 Prospectus at 8; *see id.* at 24.

[EchoCath] has not yet developed a sales organization to market and sell any of its products and there can be no assurance that [EchoCath] will be successful in establishing a sales organization or as to the effectiveness of such sales organization.... There can be no assurance that [EchoCath] will be successful in entering into any such arrangements or be able to effectively manage and maintain its relationships with others....

*Id.* at 9.

The commercialization of ... any ... proposed products utilizing [EchoCath's] technologies will depend on [EchoCath's] ability to obtain additional financing through joint ventures, licensing agreements or other collaborative arrangements or otherwise.... No assurance can be given that [EchoCath] will successfully commercialize any of its products or successfully develop any of its proposed products.

*Id.* at 24. The 17 January 1996 Prospectus also specifically references the women's healthcare products. In this regard, the 17 January 1996 Prospectus warned:

[ColorMark and EchoMark] are expected to ... require additional financing to commercialize such products. There can be no assurance as to [EchoCath's] ability to ... secure any financing.

*Id.* at 25; *see id.* at 26.

With respect to the Sales Projections Allegation, the 17 January 1996 Prospectus cautioned:

[EchoCath] has incurred losses since inception and is expected to continue to incur losses and is in need of substantial funds. There can be no assurance that [EchoCath] will ever achieve significant revenues or profitable operations.

17 January 1996 Prospectus at 7. Statements contained in the EchoCath Marketing Plan similarly discredit any allegation or inference that EchoCath possessed the intent to commit fraud. The EchoCath Marketing Plan stated:

This plan will outline the sales and marketing goals for the next two years (February 1996 – January 1998). It is intended as a beginning guide, and it is expected that it will be revised.

EchoCath Marketing Plan at 1.

In light of the foregoing, EPM has not satisfied the scienter requirement in connection with either the Possible Contracts Allegation or the Sales Projections Allegation. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1429–30.

(2) *Medtronic Allegation and Prostate Contract Allegation*

EPM also alleges that, in the EchoCath Operating Model, EchoCath stated that it anticipated licensing fees and Milestone payments in the amount of $450,000 from an agreement with Medtronic. *See* Amended Complaint at ¶¶ 21–22. EPM contends in conclusory fashion that "EchoCath knew at that time it prepared its December 20, 1996 [EchoCath] Operating Model that it was highly unlikely EchoCath would meet the performance requirements set forth in the contract in order to receive the substantial 'Milestone payments.'" *See id.* at ¶ 22. Similarly, EPM alleges that EchoCath also anticipated receiving $500,000 from a contract relating to prostate treatments, and that EchoCath knew at the time it made those projections that it was highly unlikely that it would ever sign that agreement or receive income from it. *See* Amended Complaint at ¶ 24.

EPM does not identify in the Amended Complaint what performance requirements were involved in the contract with Medtronic.

In addition, EPM does not present any factual allegations in support of its assertions that EchoCath knew that it would not meet these performance requirements. Similarly, EPM does not present any factual allegations in support of its assertions that EchoCath knew that the prostate treatment contract would not be signed. Instead, EPM alleges vaguely that

> EchoCath had no reasonable basis to support [these] projection[s] and knew at all times relevant hereto that [they were] false and misleading.... EchoCath made [these] false and misleading projection[s] in an effort to conceal EchoCath's true financial condition and to induce [EPM] into making a substantial investment in EchoCath.

*See* Amended Complaint at ¶ 23.

EPM has not satisfied the scienter requirement in connection with this allegation because it merely identified a forward-looking statement and asserted that the representation by EchoCath was made without a reasonable basis. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1429–30; *In re American Travellers Corp. Sec. Litig.*, 806 F.Supp. 547, 553–54 (E.D.Pa.1992) ("Allegations which by themselves indicate nothing more than innocent mistake or mismanagement cannot be transformed into a claim for fraud merely by asserting that plaintiffs 'knew' that their predictions were inaccurate.").

Prior and contemporaneous information made available to EPM in connection with the Offering forecloses any inference that EchoCath possessed the requisite scienter. As stated above, the EchoCath Operating Model alerted EPM that "negotiations for these contracts [were] in process." *See* EchoCath Operating Model at 2. The 17 January 1996 Prospectus similarly stated:

> [EchoCath] intends to pursue licensing, joint development and other collaborative arrangements with other strategic partners. *There can be no assurance, however, that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies.*

*See* 17 January 1996 Prospectus at 8; *see also id.* at 24 (emphasis added). EPM did not plead, and it appears EchoCath never guaranteed, the consummation of the anticipated contracts with Medtronic or the unnamed company. Moreover, EPM did not plead EchoCath even once stated the contracts were consummated.

#### (3) *Cash Balance Allegation*

▮ EPM also fails to allege scienter with respect to its allegation that EchoCath, through Mulvena, told EPM on or about 23 December 1996 that the purchase of the Securities by EPM, together with other outside investment, would provide EchoCath with sufficient funds to last 18–24 months. *See* Amended Complaint at ¶¶ 26–27.

As mentioned, EPM did not delineate exactly when the 18–24 month period began to run. *See id.* at ¶ 26. It thus appears, as previously indicated, the 18–24 month period overlaps, at least to some extent, the corresponding period represented in the 17 January 1996 Prospectus. *See* 17 January 1996 Prospectus at 7, 23. According to the 17 January 1996 Prospectus, the time period in which operating funds would be sufficient expired in June 1997, three months before EchoCath advised EPM it needed additional operating funds. *See* Amended Complaint at ¶ 27.

Irrespective of when the time period expired, EPM acknowledges EchoCath advised it on 23 December 1996 that it needed "other outside investment" beyond that provided by EPM. *See* Amended Complaint at ¶ 26. EPM further recognized EchoCath informed it on the same day that investments in EchoCath were "anticipated." *See id.* In light of the failure of EchoCath to guarantee the receipt of investments in December 1996, the statement by EchoCath in September 1997 that it still needed additional investment is not surprising, much more misleading. *See In re American Travellers Corp. Sec. Litig.*, 806 F.Supp. at 553–54. EPM has not demonstrated that the statement was fraudulent. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1429–30.

The similar, if not identical, written disclosures of EchoCath previously contained in the 17 January 1996 Prospectus evidence a lack of intent on the part of EchoCath to commit fraud. As discussed, the 17 January 1996 Prospectus, which predated the oral representations by Mulvena as to the sufficiency of operating funds, set forth the assertions later made by Mulvena on 23 December 1996. *See* 17 January 1996 Prospectus at 7, 23; *see also* Amended Complaint at ¶ 26. The 17 January 1996 Prospectus provided, in relevant part:

> [EchoCath] believes that the net proceeds from the Offering, together with funds expected to be generated from operations, will be sufficient to meet its cash requirements for approximately 12 to 18 months following consummation of the Offering; *however, there can be no assurance that [EchoCath] will not require additional financing prior to that time or that, if required, additional financing will be available on acceptable terms or at all. In any event, [EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.*

*See* 17 January 1996 Prospectus at 7 (emphasis added); *see also id.* at 23. The later representations of Mulvena concerning the sufficiency of operating funds track the earlier representations in the 17 January 1996 Prospectus. *Compare* Amended Complaint at ¶ 26 *with* 17 January Prospectus at 7 & 23. The failure of EPM to take heed of the cautionary language in the 17 January 1996 Prospectus concerning the sufficiency of operating funds undercuts its allegation that the later statement of Mulvena was fraudulent. The cautionary language in the 17 January 1996 Prospectus renders the Cash Balance Allegation inadequate to produce a strong inference of fraudulent intent by EchoCath.

Cautionary statements made more contemporaneously with the Cash Balance Allegation further discredit EPM's conclusory allegations of scienter. The 1996 10–K of EchoCath, dated 12 December 1996, stated:

> [EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if

there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future.

*1996 10–K of EchoCath at 19; see also id.* at F–21. Together, the disclosures contained in the 17 January 1996 Prospectus and the 1996 10–K of EchoCath alerted EPM to the unpredictability of available operating funds.

On its face, each allegation by EPM of misrepresentation amounts to a claim of "fraud by hindsight." The Amended Complaint fails to plead any facts which give rise to an inference that EchoCath acted with any fraudulent intent. The only explanation EPM offers for its assertions of scienter is that the representations by EchoCath did not materialize, from which EPM concludes EchoCath knew they would not materialize when they were made.

As mentioned, EPM must do more than point to a bad result and allege fraud. *See In re GlenFed Inc. Sec. Litig.,* 42 F.3d at 1548; *Wallace,* 1997 WL 602808, at \*16; *Sun Co., Inc.,* 939 F.Supp. at 369; *In re Chambers Dev. Sec. Litig.,* 848 F.Supp. at 616. The assertions by EPM that there was "no reasonable basis" for the projections of EchoCath or that EchoCath knew the various contracts would not be signed simply mouth a conclusion of law. Such an allegation is not sufficient to satisfy the pleading requirements of Rule 9(b) or the substantive requirements of Rule 10b–5. *See In re Burlington Coat Sec. Litig.,* 114 F.3d at 1429.

EPM was required to plead with factual particularity how the representations by EchoCath were misleading at the time they were made. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d at 1547–48 n. 7 and 1549; *Wallace,* 1997 WL 602808, at \*16; *Sun Co., Inc.,* 939 F.Supp. at 369; *In re Chambers Dev. Sec. Litig.,* 848 F.Supp. at 616. EPM failed to do this. None of the allegations made by EPM are adequate to produce a strong inference of fraudulent intent by EchoCath.

#### c. *Reliance*

EchoCath asserts the Amended Complaint does not sufficiently allege that EPM relied

on the Alleged Misrepresentations of Echo-Cath. *See* Moving Brief at 21.

### (1) *Reasonable Reliance Requirement*

Reliance on a false statement or omission of material fact must be reasonable and justifiable. *See Kline,* 24 F.3d at 488; *Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.,* 132 F.3d 1017, 1027 (4th Cir.1997); *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 296 (3d Cir.1991); *In re the Prudential Ins. Co. of Am. Sales Practice Litig.,* 975 F.Supp. 584, 611 (D.N.J.1996). An action for securities fraud cannot lie if a plaintiff fails to plead, much more prove, reasonable and justifiable reliance on alleged omissions or misstatements. *See Banca Cremi,* 132 F.3d at 1028; *Prudential Ins. Co.,* 975 F.Supp. at 611.

The reasonable reliance requirement " 'requir[es] plaintiffs to invest carefully.' " *See Banca Cremi,* 132 F.3d at 1028 (quoting *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.1977)). Reliance is neither reasonable nor justifiable when an investor " 'possesses information sufficient to call a [mis-]representation into question,' but nevertheless 'close[s] his eyes to a known risk." *Id.* (quoting *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985)).

When determining the reasonableness of the reliance by a plaintiff on the representation of a defendant, several factors should be considered. These factors include, but are not limited to, the sophistication of a plaintiff, whether there has been a long-standing business or personal relationships among the parties, access to the relevant information, whether a fiduciary relationship between the parties existed and the opportunity of a plaintiff to detect the alleged fraud. *See Banca Cremi,* 132 F.3d at 1028 (enumerating similar factors); *Kline,* 24 F.3d at 488.

An assertion by a plaintiff that he or she failed to read several available documents is unavailing. *See First Union Discount Brokerage Servs., Inc. v. Milos,* 997 F.2d 835, 846 n. 21 (11th Cir.1993); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983). In this connection, reliance on oral misrepresentations is not reasonable if such misrepresentations are expressly and directly contradicted by available documents. *See Bhatla v. Resort Dev. Corp.,* 720 F.Supp. 501, 506 (W.D.Pa.1989) (citing *Zobrist,* 708 F.2d 1511).

The failure of a plaintiff to read available documents which contradict oral misrepresentations or omissions may prove fatal to a securities fraud claim. Where a seller of securities fully discloses all material information in documents made available to a plaintiff purchaser, and such written disclosures expressly and directly contradict oral misstatements, a purchaser cannot adequately plead reasonable reliance on oral misrepresentations. *See First Union Discount Brokerage Servs., Inc.,* 997 F.3d at 846 & n. 22; *Associates in Adolescent Psych. v. S.C. Home Life Ins. Co.,* 941 F.2d 561, 571 (7th Cir.1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements.").

Policy considerations support this conclusion:

A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires.... Otherwise even the most careful seller is at risk, for it is easy to claim: 'Despite what the written documents say, one of your agents told me something else.' If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

*Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988). To avoid blind reliance on oral statements and increased risk to sellers, plaintiff investors are "charged with 'knowledge of information of which they reasonably should be aware.' " *See Lewis v. Chrysler Corp.,* 949 F.2d 644, 651 (3d Cir.1991) (citing *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1492 (D.Del.1984)); *Wiley v. Hughes Capital Corp.,* 746 F.Supp. 1264, 1287 (D.N.J.1990). Consequently, a plaintiff who fails to read

available documents cannot plead ignorance of the falsity of the oral misrepresentations.

In this case, it was not reasonable for EPM to rely on the asserted oral representations made by EchoCath. First, all of the Alleged Misrepresentations involved future predictions by EchoCath, e.g., that certain contracts would be signed and that certain income was anticipated. As indicated, the EchoCath Operating Model did not guarantee the consummation of such contracts or the receipt of any income from the contracts. *See* EchoCath Operating Model at 2. In fact, the Amended Complaint does not allege that any misrepresentations of existing fact were made at the time the statements were made. *See* Amended Complaint; *see also In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir.1989) ("[R]eliance upon a mere expression of future intention cannot be 'reasonable,' because such expressions do not constitute a sufficiently definite promise.").

Second, most of the Alleged Misrepresentations were oral in nature. *See* Amended Complaint at ¶¶ 10, 12, 13–14, 15, 17–19, 26–27; *see also* Opposition Brief at 30 ("Debarnardis made several of the central representations in discussions with EPM senior management.").[13] These oral statements by EchoCath were expressly contradicted by disclosures in the written materials provided by EchoCath to EPM. The documents reviewed and signed by EPM in connection with the purchase of the Securities contained carefully worded representations, disclaimers and covenants which render reliance on oral misrepresentations unreasonable, and preclude an assertion of blind reliance on representations to the contrary.

### (A) *Possible Contracts Allegation and Sales Projections Allegation*

■ The Possible Contracts Allegation relies on oral promises by DeBernardis in August 1996 and January 1997 that it was on the verge of signing contracts with third parties for the commercialization of its health products for women. *See* Amended Complaint at ¶¶ 10, 15. The Sales Projections Allegation is based upon written statements which "repeated" earlier oral representations made by DeBernardis. *See id.* at ¶¶ 12, 13. In particular, EPM alleges DeBernardis orally represented, over a period from November 1996 to February 1997, that EchoCath was "actively moving forward with the line of women's health products." *See id.* at ¶ 12.

The representations in the documents provided to EPM before and after the so-called misstatements of DeBernardis contradict and discredit the oral representations which comprise both the Possible Contracts Allegation and the Sales Projections Allegation. The EchoCath Operating Model, issued on 20 December 1996, counters many of the oral representations. The EchoCath Operating Model omitted any predictions as to the likelihood of obtaining income from outside sources or consummating contracts with third parties. The EchoCath Operating Model stated only that "[n]egotiations for these contracts are in process." *See* EchoCath Operating Model at 2.

Additionally, the 17 January 1996 Prospectus contained explicit disclaimers and warnings which contradict the optimistic tone of the oral representations included in the Possible Contracts Allegation and the Sales Projections Allegation. The 17 January 1996 Prospectus did not guarantee the receipt of outside income or the consummation of contracts. Rather, it disclaimed:

> There can be no assurance ... that [Echo-Cath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies.

---

13. The Medtronic Allegation and the Prostate Contract Allegation were based upon written representations contained in the EchoCath Operating Model; these representations were not oral in nature. *See* Amended Complaint at ¶¶ 21–23, 24; EchoCath Operating Model. Reliance by EPM on these statements therefore is not unreasonable simply because these representations are expressly contradicted by language in the 17 January 1996 Prospectus and the EchoCath Operating Model. However, as discussed below, the quality and quantity of cautionary language contained in the documents precludes reasonable reliance on these written representations. *See In re Donald Trump Sec. Litig.*, 7 F.3d at 371–72; *Kline*, 24 F.3d at 487.

17 January 1996 Prospectus at 8. Additionally, The 17 January 1996 Prospectus unequivocally stated:

> [EchoCath] has not yet developed a sales organization to market and sell any of its products and there can be no assurance that [EchoCath] will be successful in establishing a sales organization or as to the effectiveness of such sales organization.... There can be no assurance that [EchoCath] will be successful in entering into any such arrangements....

*Id.* at 9. The 17 January 1996 Prospectus expressly declined to guarantee successful commercialization of its women's health products, "EchoMark" and "ColorMark." *See id.* at 25, 26.

■ Statements contained in the 17 January 1996 Prospectus also contradict financial projections alleged in the Sales Projection Allegation. The 17 January 1996 Prospectus alerted investors to the "marketing problems and additional costs and expenses that may exceed current estimates." 17 January 1996 Prospectus at 7. The 17 January 1996 Prospectus repeatedly expressed doubt as to whether "[EchoCath] will ever achieve profitable operations." *See, e.g.,* 17 January 1996 Prospectus at 21; *see also id.* at 5 ("[EchoCath] is a development stage company and has not conducted any significant operations to date or received any significant operating revenues."); *id.* at 7 ("[EchoCath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future.").

The disclosures in the 1996 10–K of Echo-Cath, dated 12 December 1996, also are at variance with the oral representations contained in the Possible Contracts Allegation and Sales Projections Allegation.

> [EchoCath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future.... No assurance can be given that [EchoCath] will successfully commercialize any of its products or achieve profitable operations.

1996 10–K of EchoCath at 3. The 1996 10–K of EchoCath noted the intention of EchoCath to enter into joint venture, licensing or other collaborative agreements. However, it expressly refrained from predicting the likelihood that such agreements would be reached. *See* 1996 10–K of EchoCath at 9. EchoCath further disclosed:

> There can be no assurance that [Echo-Cath] will be able to complete the license agreements and strategic alliances on acceptable terms.... [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath]. There can be no assurance that [Echo-Cath] will be able to obtain financing from any other source on acceptable terms.

1996 10–K of EchoCath at 20. The 1997 10–Q of EchoCath contained identical disclosures. *See* 1997 10–Q of EchoCath at 8.

### (B) *Cash Balance Allegation*

■ The Cash Balance Allegation similarly is based upon the oral representation of Mulvena on 23 December 1996 that the investment in EPM, together with outside investments, would provide EchoCath with sufficient funds to last eighteen to twenty-four months. *See* Amended Complaint at ¶¶ 26–27. Language previously contained in the 17 January 1996 Prospectus expressly and directly contradicts the Cash Balance Allegation. As previously discussed, the 17 January 1996 Prospectus stated: "[T]here can be no assurance that [EchoCath] will not require additional financing prior to that time or that, if required, additional financing will be available on acceptable terms or at all." See 17 January 1996 Prospectus at 7. The 17 January 1996 Prospectus further disclosed:

> [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath] and there can be no assurance that additional financing will be available on terms favorable or acceptable to [Echo-Cath], if at all. Failure to obtain such additional financing would have a material adverse effect on [EchoCath's] business and prospects and could require [Echo-Cath] to severely limit or cease its operations.

*Id.*

> [EchoCath] may be required to seek additional financing during such period in the

event of delays, lack of market acceptance, cost overruns, delays in obtaining regulatory approvals or unanticipated expenses associated with a company in an early stage of development.

*Id.* at 23.

[EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.

*Id.* at 7.

Issued eleven days before the Cash Balance Allegation, the 1996 10–K of EchoCath, dated 12 December 1996, similarly cautioned:

[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future.

1996 10–K of EchoCath at 19; *see id.* at F–21.

These contradictory written disclosures put EPM on notice that additional financing was necessary and the contracts with third parties had not been, and might never be, consummated. EPM cannot blindly and unreasonably rely on oral statements and close its eyes to the obvious risks expressly delineated in the Prospectus and related documents. *See Banca Cremi,* 132 F.3d at 1028.

Not only do these contradictory written disclosures foreclose reasonable reliance on the Alleged Misrepresentations, but they also preclude satisfaction of the additional requirement of Rule 9(b) that EPM plead with particularity its ignorance of the falsity of the misrepresentations. *See In re Westinghouse Sec. Litig.,* 90 F.3d at 710; *Shapiro,* 964 F.2d at 285 (pleading ignorance requires a plaintiff to "thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint").

### (2) The "Bespeaks Caution" Doctrine

 EchoCath argues that the "bespeaks caution" doctrine precludes EPM from succeeding on its fraud claims. The "bespeaks caution" doctrine provides that when

'forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information ... provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.'

*Weiner,* 129 F.3d at 320 (quoting *In re Donald Trump Sec. Litig.,* 7 F.3d at 371). The doctrine is "shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *In re Donald Trump Sec. Litig.,* 7 F.3d at 363.

 Not all disclaimers are inactionable pursuant to the "bespeaks caution" doctrine. "[V]ague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *In re Donald Trump Sec. Litig.,* 7 F.3d at 371. In order for a disclaimer to fall within the protection of the doctrine,

[t]he cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.

*Id.* at 371–72. A defendant must establish that the cautionary statements "relate directly to that on which investors claim to have relied." *Kline,* 24 F.3d at 489. A cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

 The doctrine is available only for "forward-looking" statements. It cannot be invoked for statements of existing fact. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 371; *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996); *Voit v. Wonderware Corp.,* 977 F.Supp. 363, 371–72 (E.D.Pa. 1997). "The doctrine is most commonly applied to prospectuses, offerings and other 'forward looking' statements, but there is no logical reason not to apply it to predictions or other forward looking statements contained

in SEC filings such as a Form 10–K or annual report." *Pearl v. Geriatric & Medical Centers, Inc.*, No. 92–5113, 1995 WL 243675, at *2 (E.D.Pa. Apr.20, 1995).

The Reform Act added to the Exchange Act a safe harbor provision which incorporates the "bespeaks caution" doctrine. *See* §§ 21E(c) and 21E(i)(1) of the Exchange Act, 15 U.S.C. §§ 78u–5(c) and 78u–5(i)(1); *see also Weiner*, 928 F.Supp. at 1388 ("The [Reform Act] codifies judicial interpretation of Section 10(b) and Rule 10b–5."). Pursuant to the Reform Act, no liability attaches to forward-looking statements [14] if the statement is accompanied by "meaningful and cautionary statements identifying important factors that could cause actual results to differ materially" from the results predicted, or if the statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i). In addition to incorporating a "bespeaks caution" prong for forward-looking statements, the Reform Act provides additional statutory protection to defendants in the form of an "actual knowledge" prong. Specifically, a defendant is not liable under the Reform Act where a plaintiff fails to plead the forward-looking statement in issue was made with actual knowledge of its falsity. *See* 15 U.S.C. § 78u–5(c)(1)(B).

As discussed in connection with the scienter requirements under Rule 10b–5, EPM has not pleaded with particularity facts indicating actual knowledge on the part of Echo-Cath. Under the Reform Act, this failure alone provides a sufficient basis dismissal of the Amended Complaint. *See id.* Moreover, as explained in greater detail below, the "bespeaks caution" doctrine is available to Echo-Cath, pursuant to both the Reform Act and case law in this Circuit. *See* Conference Report at 43 (in enacting the Reform Act,

Congress "[did] not intend to replace the 'bespeaks caution' doctrine or to foreclose further development of that doctrine by the courts.")

■■■ EPM argues the "bespeaks caution" doctrine does not apply in this case because "the vast majority of the misrepresentations specifically delineated in the Amended Complaint were communicated orally or in documents other than the public filings EchoCath now uses as a shield." *See* Opposition Brief at 30. In addition, EPM contends the misrepresentations are not countered in any respect by the general risk disclosure language in the public filings of EchoCath. EPM argues, moreover, the precise misrepresentations described in the Amended Complaint are not rebutted by the risk disclosures in the public filings of EchoCath.

The cautionary statements included in the documents made available to EPM imparted warnings specifically tailored to particular risks. The first page of the 17 January 1996 Prospectus stated:

**AN INVESTMENT IN THESE SECURITIES INVOLVES A HIGH DEGREE OF RISK AND IMMEDIATE AND SUBSTANTIAL DILUTION. SEE "RISK FACTORS" BEGINNING ON PAGE 7 AND "DILUTION."**

17 January 1996 Prospectus at 1 (emphasis in original); *see also id.* at 7 ("The securities being offered hereby are speculative in nature and involve a high degree of risk."). The "Risk Factors" section of the 17 January 1996 Prospectus stated "prospective investors should carefully consider" that Echo-Cath "is a development stage company" with no assurance it can "successfully manage the

**14.** The Reform Act defines forward-looking statements to include:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items; (2) A statement of management's plans and objectives for future operations; (3) A statement of future economic performance ... or (4) Disclosed statements of the assumptions underlying or relating to any of the statements ... above.

*See* 15 U.S.C. § 78u–5(i)(1). Excluded from the safe harbor provision are forward-looking state-

ments contained in financial statements and registration statements, as well as statements made in connection with initial public offerings. *See* 15 U.S.C. § 78u–5(b)(2)(A–C). It appears, however, the majority of the Alleged Misrepresentations were issued orally or in the EchoCath Operating Model. To the extent any of the Alleged Misrepresentations were made in connection with the initial public offering or in the financial statements, the judicially-created "bespeaks caution" doctrine still applies. *See* Conference Report at 43; 141 Cong.Rec. H13704 (daily ed. 28 Nov. 1995); *see also Weiner*, 928 F.Supp. at 1388.

transition to a commercial enterprise." *See id.* at 7. EchoCath advised prospective investors of

> unanticipated problems relating to development of proposed products, testing, regulatory compliance, manufacturing and assembly, the competitive environment ... marketing problems and additional costs and expenses that may exceed current estimates.

*Id.* EchoCath cautioned:

> There can be no assurance that after the expenditure of substantial funds and efforts, [EchoCath] will ever achieve and maintain a substantial level of sales of its products or that any of [EchoCath's] proposed products will be successfully developed.

*Id.*

In addition, the 17 January 1996 Prospectus alerted potential investors to the less than impressive financial beginnings of Echo-Cath:

> [EchoCath] is a development stage company which has limited sales and which has incurred substantial losses since inception. An investment in the securities offered hereby is speculative in nature and involves a high degree of risk. Prior to making any investment decision, prospective investors should read and carefully review the "Risk Factors" section of this Prospectus.

*Id.* at 5. From its inception through 30 November 1995, EchoCath "incurred a cumulative net loss of $(8,882,772)." *Id.* at 7; *see id.* at 22 ("[EchoCath] has sustained cumulative losses of approximately $(8,883,000) through November 30, 1995."). As of 30 November 1995, "[EchoCath] had a working capital deficit of $(2,079,000), an accumulated deficit of approximately $(5,680,000) and a stockholders' deficit of approximately $(2,398,000), which deficiencies are expected to increase." *Id.* at 22; *see id.* at 7 (noting these deficiencies "have increased to date"). The 17 January 1996 Prospectus identified Operating losses for the years ended August 31, 1994 and 1995 to be "($1,998,189) and ($1,418,244), respectively." *See id.* at 7.

Potential purchasers also were informed:

> [T]he market prices for securities of emerging and development stage biotechnology companies have historically been highly volatile. Future announcements concerning [EchoCath] or its competitors, including the results of testing, technological innovations or new commercial products, government regulations, developments concerning proprietary rights, litigation or public concern as to safety of [EchoCath's] proposed products may have a significant impact on the market price of [EchoCath's] securities.

*Id.* at 12.

Significantly, the 17 January 1996 Prospectus also warned "[a] purchaser in the Offering will experience immediate and substantial dilution of approximately $4.24 per share or 85% from the initial public offering price per share of $5.00." *Id.* at 11. The 17 January 1996 Prospectus also set out how some of this money would be used. For example, it stated the net proceeds from the Offering would be "approximately $5,485,000 ... after deducting underwriting discounts and commissions and expenses of the Offering of approximately $1,614,750." *Id.* at 15. Of these proceeds, approximately 28 percent would be used for "general corporate purposes, including $1,000,000 in aggregate annual base compensation." *Id.* Elsewhere the 17 January 1996 Prospectus noted "[a]pproximately $610,000 of the net proceeds of the Offering will be used to pay annual salaries for current executive officers of [EchoCath]." *Id.* at 11.

With respect to the future financial soundness of EchoCath, the 17 January 1996 Prospectus advised that EchoCath could not give assurances that it would "achieve significant revenues or profitable operations." *See id.* at 7; *see also id.* at 21. The document disclosed additional research, development and testing activities, combined with marketing and distribution and other general expenses incurred, "are expected to result in continuing operating losses for the foreseeable future." *See id.* at 7; *see also id.* at 21 ("[EchoCath's] research and development and general and administrative expenses will increase following this Offering when [Echo-Cath] incurs substantial research and manu-

facturing expenses, expenses for the payment of salaries to officers and employees, and consulting fees which have recently increased and are expecting to increase. In addition, [EchoCath] plans to increase its expenditures in the sales and marketing areas."); *id.* at 22 ("[EchoCath] expects to continue to incur costs in connection with [investing] activities."); *id.* at 24 ("[EchoCath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future. No assurance can be given that [EchoCath] will successfully commercialize any of its products or successfully develop any of its proposed products.").

The 17 January 1996 Prospectus further stated the auditors for EchoCath doubted whether EchoCath could continue as a going concern. *See id.* at 7; *see also id.* at 22. It stated:

> The report of [EchoCath's] independent auditors contains an explanatory paragraph as to [EchoCath's] ability to continue as a going concern. Among the factors cited by the auditors as raising substantial doubt as to [EchoCath's] ability to continue as a going concern is that [EchoCath] has incurred losses since inception and is expected to continue to incur losses and is in need of substantial funds. There can be no assurance that [EchoCath] will ever achieve significant revenues or profitable information.

*Id.* at 7 (citing Report of Independent Certified Public Accountants); *see also id.* at 22.

The 17 January 1996 Prospectus also expressly made the successful commercialization of the products at issue contingent upon additional financing:

> Although [EchoCath] will allocate a portion of the proceeds of the Offering for the continued development of these products, the commercialization of any products incorporating these technologies ... will depend on [EchoCath's] ability to obtain additional financing through joint ventures, licensing agreements or other collaborative arrangements or otherwise.

*Id.* at 4, 24; *see id.* at 23 ("Although [EchoCath] may use a minimal portion of the proceeds of the Offering to conduct research and

development activities on additional products utilizing the ColorMark or other technologies, the proceeds of the Offering will not be sufficient to complete development efforts of any of these proposed products and [EchoCath] will require substantial additional funds to pursue activities in these areas.").

EchoCath expressed its belief that the net proceeds from the Offering and funds generated from operations would be sufficient to meet its cash requirements for only approximately twelve to eighteen months following the Offering. *See id.* at 7, 23. The 17 January 1996 Prospectus, however, expressly cautioned:

> [EchoCath] may be required to seek additional financing during such period in the event of delays, lack of market acceptance, cost overruns, delays in obtaining regulatory approvals or unanticipated expenses associated with a company in an early stage of development.

*Id.* at 23; *see id.* at 7 ("[T]here can be no assurances that [EchoCath] will not require additional financing prior to that time."). In addition, the 17 January 1996 Prospectus stated:

> [T]here can be no assurances that ..., if required, additional financing will be available on acceptable terms or at all. In any event, [EchoCath] will require substantial additional financing in the future to fully implement its proposed business plan.

*Id.* at 7; *see id.* at 23 (indicating EchoCath might need "substantial additional financing in the future to fully implement its proposed business plan"). The 17 January 1996 Prospectus warned that "[i]n the event the necessary financing is not obtained, [EchoCath] would be materially adversely affected and may have to cease or substantially reduce operations." *Id.* at 23.

Although the 17 January 1996 Prospectus mentioned the intention of EchoCath to pursue "licensing, joint development and other collaborative arrangements with other strategic partners," it also warned:

> There can be no assurance ... that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever de-

vote sufficient resources to [EchoCath's] technologies.

*Id.* at 8; *see id.* at 31 ("If [EchoCath] is unable to effectively manage and maintain relationships with others, its ability to market and sell its products in foreign markets and possibly in the United States will be affected. There can be no assurance that [EchoCath] will be successful in entering into any arrangements, [or] be able to effectively manage and maintain its relationships with others."). The 17 January 1996 Prospectus indicated EchoCath did not have any binding commitments for financing. *See id.* at 7, 23.

The 17 January 1996 Prospectus also highlighted the "limited manufacturing and assembly experience" and the "limited marketing and sales experience" of EchoCath. *See id.* at 8–9. The 17 January 1996 Prospectus accordingly recognized the "potential dependence on outside parties" for manufacturing, assembly, marketing and sales. *See id.* The 17 January 1996 Prospectus stated, however:

> [EchoCath] currently does not have written agreements with any of its suppliers for manufacturing or assembly.... [T]here can be no assurance that [Echo-Cath] will be able to establish a commercial relationship with any ... supplier of the necessary components or third party manufacturer in which case it may be required to suspend or curtail the manufacture of its products which could have a material adverse effect on [EchoCath] [and] there can be no assurances that [EchoCath] will be able to recruit, train or retain qualified personnel to market and sell such products.

*Id.* at 31. The 17 January 1996 Prospectus further stated:

> No assurance can be given that [Echo-Cath] will ever be able to establish commercial sales manufacturing operations.... [T]here can be no assurance that [EchoCath] will be successful in establishing a sales organization [to market and sell any of its products] or as to the effectiveness of such sales organization.

*Id.* at 8, 9; *see id.* at 31 ("[EchoCath] has not yet developed a sales organization to market and sell its products.").

EchoCath also predicated successful commercialization of its products in part upon "[EchoCath's] ability to attract and retain highly qualified personnel." *See id.* at 9. EchoCath stated:

> There can be no assurance that [Echo-Cath] will be able to recruit, train or retain qualified personnel to market and sell such products. Failure to recruit, train, and retain qualified personnel could have a material adverse effect on [EchoCath's] business and results of operations. Marketing of [EchoCath's] products will require significant additional capital and management resources. There can be no assurance that [EchoCath] will be able to obtain the requisite additional funds to successfully market and sell its products.

*Id.* at 31.

Successful commercialization of the products of EchoCath was also dependent, in part, upon "acceptance of [EchoCath's] products by the medical community as safe, useful, and cost effective," "adequate reimbursement from third-party health care payors" and "patent protection of its technologies." *See id.* at 7–9, 36. EchoCath expressly declined to assure the occurrence of these contingencies. *See id.* at 7–10, 34–36.

EchoCath also warned potential investors of increased expenditures in connection with the sale of the Securities, which translated into "substantially increased operating losses for the foreseeable future," and no assurance of profitability. *See id.* at 21. EchoCath explained:

> [EchoCath's] research and development and general and administrative expenses will increase following this Offering when [EchoCath] incurs substantial research and manufacturing expenses, expenses for the payment of salaries to officers and employees, and consulting fees which have recently increased and are expected to continue to increase. In addition, [EchoCath] plans to increase its expenditures in the sales and marketing areas.

*Id.* at 21.

The 1996 10–K of EchoCath, dated 12 December 1996, contained similar cautionary language:

[EchoCath's] operations have not generated significant revenues to date. [Echo-Cath] has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future.... No assurances can be given that [EchoCath] will successfully commercialize any of its products or achieve profitable operations.

1996 10–K of EchoCath at 3; *see also* 17 January 1996 Prospectus at 24 (same). The 1996 10–K of EchoCath further provided:

[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products, and accordingly, it expects to incur substantially increased operating losses for the foreseeable future. There can be no assurance that [EchoCath] will ever achieve profitable operations.

1996 10–K of EchoCath at 19; *see id.* at F–21. In the section entitled "Notes to Financial Statements," it is similarly noted:

[EchoCath] has those risks associated with companies in the development stage, including but not limited to, its dependence on key management and the continuing need for additional financing to fund research and development and commercialization activities. There can be no assurance that commercially successful products will be developed or that the Company will achieve profitability at all or on a sustained basis.

*Id.* at F–7.

In that regard, the 1996 10–K of EchoCath indicated that its revenues for 1996 were only $108,025, on a net operating loss of $2,921,-575. EchoCath revealed it "had no significant sales revenue for the fiscal years ended August 31, 1996 and 1995." *Id.* at 19. Echo-Cath also disclosed it had sustained cumulative losses of approximately $11,395,000 through August 31, 1996. *See id.* Approximately one-half of the losses were incurred in connection with marketing and general and administrative activities, many of which "are continuing." *See id.*

Additionally, the 1996 10–K of EchoCath alerted potential investors that:

[competitors] may succeed in developing products that are more effective or less costly than those developed by [EchoCath] and may be more successful than [Echo-Cath] in manufacturing and marketing their products.... Many of [EchoCath's] competitors and potential competitors have substantially greater financial, technological, manufacturing, marketing, distribution, operating, technical and other resources than [EchoCath.]

*Id.* at 11. The 1996 10–K of EchoCath also disclosed:

[EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath.] There can be no assurance that [EchoCath] will be able to obtain financing form any other sources on acceptable terms.

*Id.* at 20; *see id.* at F–21. All of these statements in the 1996 10–K of EchoCath were consistent with the statements in the 17 January 1996 Prospectus. The 1996 10–K of EchoCath was available to EPM two months before it entered into the Subscription Agreement in February 1997.

The 1997 10–Q of EchoCath, filed on 21 January 1997, was also pessimistic about the prospect of EchoCath for success. It stated EchoCath would run out of cash after December 1997, absent additional financing. *See* 1997 10–Q of EchoCath at 8. It revealed:

Research and Development expenses increased 118% during the three months ending November 30, 1996.... The quarter ending November 30, 1995 was the last quarter before the Initial Public Offering and [EchoCath] did not have the resources to match the current level of expenditure.

*Id.* It also stated that there were a variety of known and unknown risks that made even this prediction possibly optimistic. It listed factors which could negatively impact the performance of EchoCath:

Such factors include, among others ... delays in product development; ... general economic and business conditions; industry capacity; industry trends; demographic changes; competition; material costs and availability; the loss of any significant customers; changes in business

strategy or development plans; quality of management; availability, terms and deployment of capital; business abilities and judgment of personnel; availability of qualified personnel....

*Id.* The 1997 10–Q of EchoCath also stated that EchoCath had no assurance of succeeding in its efforts to sign licensing or other collaborative agreements, and had "no binding commitments from any third parties to provide funds to [EchoCath]." *Id.* The statements in the 1997 10–Q of EchoCath are consistent with the statements in both the 1996 10–K of EchoCath and the 17 January 1996 Prospectus. All three documents (hereinafter collectively referred to as the "Offering Documents") were available to EPM before it signed the Subscription Agreement.

In the Subscription Agreement, signed by EPM, EPM acknowledged that "an investment in the Shares involves a number of very significant risks and [EPM] is able to bear the loss of its entire investment." *Subscription Agreement* at 2. EPM recognized it "must bear the economic risk of the investment indefinitely." *Subscription Agreement* at 2.

EPM advised EchoCath that it conducted a due diligence review. In connection with the due diligence review, EPM acknowledged "all documents, records, and books pertaining to the investment ... have been made available for inspection." *Subscription Agreement* at 2. EPM specifically acknowledged it received and reviewed the 1996 10–K of EchoCath. *See* Subscription Agreement at 2.

Also in the Subscription Agreement, EPM disclaimed reliance on any advice from Echo-Cath as to the "economic considerations of an investment in the Shares." *Subscription Agreement* at 2. Instead, EPM acknowledged its sophistication in connection with the purchase:

> The undersigned [EPM] has such knowledge and experience in financial tax, and business matters so as to enable it to utilize the information made available to it in connection with the offering of the Shares to evaluate the merits and risks of an investment in the Shares and to make

an informed investment decision with respect thereto.

*See* Subscription Agreement at 2.

The language in the Subscription Agreement, the 1997 10–Q of EchoCath, the 1996 10–K of EchoCath and the 17 January 1996 Prospectus effectively "bespeak caution," rendering the Alleged Misrepresentations by EchoCath immaterial, as a matter of law. Absent further delineation in the Reform Act of what constitutes "meaningful cautionary statements," *see* 15 U.S.C. § 78u–5(c)(1)(A)(i), case law in this Circuit interpreting the judicially-created doctrine provides guidance.

■■■ This Circuit has held consistently that the existence of carefully worded disclaimers in documents which precede, succeed or contain certain misrepresentations precluded reasonable reliance on such misrepresentations. The plaintiffs in *In re Donald Trump Securities Litigation* alleged the defendants fraudulently misrepresented in a prospectus that the defendants believed funds generated from the operations of the Taj Mahal casino would be sufficient to cover all of its debt service. 7 F.3d at 368. In affirming the district court dismissal of the complaint, the Circuit held the prospectus "truly bespeaks caution":

> [N]ot only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement the plaintiffs challenge. That is to say, the cautionary statements were tailored precisely to address the uncertainty concerning the [defendants'] prospective ability to repay the bondholders.

*Id.* at 372. The precisely phrased cautionary language which the Circuit found dispositive included a "Special Considerations" section of the prospectus, which disclosed risks inherent to the casino venture. The prospectus also highlighted the competitiveness of the casino industry, warned that actual operating results might not meet the expectations of the defendants and omitted assurances about the future growth of the market in Atlantic City. *See id.* at 369–71. The Third Circuit concluded these disclaimers, which were less carefully worded than those involved in the

instant case, rendered the misrepresentations and omissions immaterial as a matter of law.

In *Weiner*, the Circuit affirmed the dismissal of a Section 10b–5 claim predicated on an allegedly inaccurate earnings growth projection. The court held the prior projection was "neutralized, and thereby made immaterial" by a specific disclaimer in the 1994 Annual Report of the defendant. This disclaimer "cured" any misleading effect the prior statement might have had. *See Weiner*, 129 F.3d at 321.

In the instant case, documents containing cautionary statements were issued before, contemporaneously with and after the Alleged Misrepresentations. These statements surrounding the Alleged Misrepresentations were not only substantive but also were specifically tailored to address the uncertainties of EchoCath regarding potential contracts, its financial condition and its need for additional financing. These disclosures addressed the precise subject matter of each of the Alleged Misrepresentations. *See In re Donald Trump Sec. Litig.*, 7 F.3d at 371–72; *Weiner*, 129 F.3d at 321.

The Possible Contracts Allegation, as previously mentioned, encompassed representations made by EchoCath in August 1996 that it was "on the verge" of signing contracts with third parties for its health products for women, and representations made by Echo-Cath on 30 January 1997 that such contracts were "imminent." *See* Amended Complaint at ¶¶ 10, 15. The carefully worded language of the 17 January 1996 Prospectus, which predated the Possible Contracts Allegation put EPM on notice that the contracts with third parties had not, and might never be, consummated. *See* 17 January 1996 Prospectus at 7, 8, 23, 24. The issuance of the 1996 10–K of EchoCath on 12 December 1996, was for the most part contemporaneous with the Possible Contracts Allegation. The 1996 10–K of EchoCath similarly advised EPM:

> There can be no assurance that [Echo-Cath] will be able to complete the ...

license agreements and strategic alliances on acceptable terms.

1996 10–K of EchoCath at 20.

In the Sales Projections Allegation, EPM alleged the sales projections contained in the EchoCath Marketing Plan, dated 20 December 1996, were materially misleading and falsely optimistic. It is further alleged the content of the Sales Projections Allegations mirrored those representations made by De-Bernardis from November 1996 to February 1997. *See* Amended Complaint at ¶¶ 12, 13–14.

The 17 January 1996 Prospectus, which predated the alleged misrepresentations in the Sales Projections Allegation, alerted EPM at the outset of the unstable financial condition in which EchoCath found itself. *See, e.g.,* 17 January 1996 Prospectus at 21 ("[EchoCath] is a development stage company and has not conducted any significant operations to date or received any significant operating revenues and has limited assets."); *see id.* ("[EchoCath] anticipates that revenues will be insufficient to meet all operating expenses for the foreseeable future even if there is market acceptance of its products...."); *see also id.* at 5, 7, 8, 9, 10, 11, 23, 24, 31.

The 1996 10–K of EchoCath, dated 12 December 1996, was issued almost simultaneously with the statements comprising the Sales Projections Allegation. It stated, in relevant part: "[EchoCath] (has incurred operating losses in each of its fiscal years, and expects that operating losses will continue in the foreseeable future.") 1996 10–K of EchoCath at 3; *see id.* at 19 ("[EchoCath]) has sustained cumulative losses of approximately $(11,395,000) through August 31, 1996.").

The EchoCath Marketing Plan, containing the sales projections comprising the Sales Projections Allegation, also warned: "[The EchoCath Marketing Plan] is intended as a beginning guide, and it is expected that it will be revised." *See* EchoCath Marketing Plan at 1. The 17 January 1996 Prospectus, the 1996 10–K of EchoCath and the Echo-Cath Marketing Plan all served as notification to EPM of the financial condition of EchoCath.

The documents issued subsequent to the Possible Contracts Allegation and Sales Projections Allegation neutralized any potentially misleading effect of the prior representations. *See Weiner*, 129 F.3d at 321 ("[F]or [a] statement to have a deleterious effect, it would have had to remain 'alive' in the market, unmodified."); *In re Burlington Coat Sec. Litig.*, 114 F.3d at 1432. In this regard, the 1997 10–Q of EchoCath, filed on 21 January 1997, reiterated:

> There can be no assurances that [Echo-Cath] will be able to complete the ... license agreements and strategic alliances on acceptable terms .... [EchoCath] has no binding commitments from any third parties to provide funds to [EchoCath].
>
> * * * * * *
>
> Research and Development expenses increased 118% during the three months ending November 30, 1996.... The quarter ending November 30, 1995 was the last quarter before the Initial Public Offering and [EchoCath] did not have the resources to match the current level of expenditure.

*See* 1997 10–Q of EchoCath at 8.

Additionally, the Medtronic Allegation and Prostate Contract Allegation consisted of representations that EchoCath intended to receive license fees and Milestone payments in the amount of $450,000 from Medtronic, and income in the amount of $500,000 from an unnamed company which would use Echo-Mark technology for guiding prostate treatments. See Amended Complaint at ¶¶ 21–23, 24. These representations, all of which were contained in the EchoCath Operating Model, were simultaneously issued on 20 December 1996. *See* EchoCath Operating Model. The 17 January 1996 Prospectus and 1996 10–K of EchoCath, which predated the Medtronic Allegation and the Prostate Contract Allegation, forewarned EPM that the consummation of contracts with third parties and resulting income from outside sources were not guaranteed. *See* 17 January 1996 Prospectus at 7, 8, 23, 24; 1996 10–K of EchoCath at 20. The EchoCath Operating Model, issued contemporaneously with the Medtronic Allegation and Prostate Contract Allegation, also cautioned:

> *This Model is driven by a number of assumptions:* these include the Product Sales projections on page 2, the License and Grant Income on page 1, future Expenses as shown on page 3, and a 60 day assumption for inventory and receivables on the Balance Sheet, page 5. (It should be noted that it is assumed that we can work down the present inventory, which reflects "gearing up" prior to sale and so is larger than 60 days.)

*See* EchoCath Operating Model at 2 (emphasis added). The EchoCath Operating Model highlighted the uncertainty of the prospective ability of EchoCath to consummate such contracts, stating "[n]egotiations for these contracts are in process." *See* EchoCath Operating Model at 2.

The 1997 10–Q of EchoCath, issued subsequent to the Medtronic Allegation and Prostate Contract Allegation, cured any residual, possibly misleading effect of the earlier representations. In particular, the 1997 10–Q of EchoCath reemphasized the risk that these contracts, and the anticipated income flowing therefrom, may not come to pass. *See* 1997 10–Q of EchoCath at 8 ("There can be no assurances that [EchoCath] will be able to complete ... license agreements and strategic alliances on acceptable terms.... [Echo-Cath] has no binding commitments from any third parties to provide funds to [Echo-Cath].").

Finally, the Cash Balance Allegation, as previously mentioned, consisted of an oral representation by EchoCath on 23 December 1996 that "[EPM's] anticipated investment in EchoCath and other outside investments in [EchoCath] would provide sufficient operating funds to allow EchoCath to actively develop and market the products ... for a period of at least 18 to 24 months." *See* Amended Complaint at ¶ 26. Eleven months prior to the Cash Balance Allegation, Echo-Cath made a similar representation in the 17 January 1996 Prospectus. *See* 17 January 1996 Prospectus at 7 & 23. Surrounding language in the 17 January 1996 Prospectus put EPM on notice that outside investments in EchoCath were not assured, and additional financing would be necessary. The 17 January 1996 Prospectus stated:

*Although [EchoCath] anticipates that the net proceeds from the Offering, together with revenues expected to be derived from sales of the ColorMark Clip, should be sufficient to fund research, development, testing, regulatory requirements, operating, and other capital needs for approximately 12 to 18 months following the completion of the Offering, [EchoCath] may be required to seek additional financing during such period in the event of delays, lack of market acceptance, cost overruns, delays in obtaining regulatory approvals or unanticipated expenses associated with a company in an early stage of development. There can be no assurance that [Echo-Cath] will be able to obtain such additional financing or that such financing, if available, will be on acceptable terms.*

*See id.* at 23 (emphasis added); *see also id.* at 7. Moreover, less than one month after this alleged oral representation was made, EPM received the 1997 10–Q of EchoCath, which stated: "there can be no assurances that [EchoCath] will be able to obtain financing from any other sources on acceptable terms." *See* 1997 10–Q of EchoCath at 9.

All of the Alleged Misrepresentations were surrounded by meaningful cautionary statements which preclude reliance by EPM. The Offering Documents which were issued before or around the same time as the Alleged Misrepresentations contained precisely worded warnings which, at the outset, put EPM on notice of the financial situation of Echo-Cath. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 371 (prospectus issued contemporaneously with alleged misrepresentation sufficient to negate reasonable reliance and materiality). That EPM chose to ignore the warnings previously issued in the 17 January 1996 and the 1996 10–K of EchoCath and blindly rely on the oral representations they later received does not make its reliance any more reasonable.

The specific disclaimers included in the Offering Documents which succeeded the Alleged Misrepresentations, namely the 1997 10–Q of EchoCath, "neutralized" such representations, and "cured" any possibly misleading effect. *See Weiner,* 129 F.3d at 321

(later statements made in annual report of corporation neutralized earlier projections).

Irrespective of the time of issuance of the Offering Documents, the cautionary language contained within these documents related directly to the Alleged Misrepresentation on which EPM claims to have relied. *Kline,* 24 F.3d at 489.

In addition to disregarding the specific warnings contained in the documents issued by EchoCath in connection with the Offering, EPM ignored the provisions set forth in the contract it signed pursuant to the purchase of the Securities. Unlike the plaintiffs in *In re Donald Trump Securities Litigation* and *Weiner,* EPM expressly acknowledged its investment was speculative and could be lost entirely. *See* Subscription Agreement at 2, paragraph (n). EPM also disclaimed reliance on any advice by EchoCath in deciding whether to make the investment. *See* Subscription Agreement at 2, paragraph (j). Accordingly, EPM cannot allege justifiable reliance on the Alleged Misrepresentations when entering into the Subscription Agreement. Even if it could rely, however, as explained below EPM did not allege that its reliance on the Alleged Misrepresentations caused it to suffer economic harm or loss.

### d. *Causation*

Causation is the final requirement of a Section 10(b) and Rule 10b–5 violation. *See Weiner,* 129 F.3d at 315 (quoting *Kline,* 24 F.3d at 487); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1417; *Shapiro,* 964 F.2d at 280; *In re Phillips Petroleum Sec. Litig.,* 881 F.2d at 1244. The Third Circuit has not addressed the nature and sufficiency of the pleadings required by the plaintiff to comply with the causation requirement. Most district courts within this Circuit, however, have held that, in order to plead a claim of fraud under Rule 10b–5, a plaintiff must allege both "transaction causation" and "loss causation." *See, e.g., Edward J. DeBartolo Corp. v. Coopers & Lybrand,* 928 F.Supp. 557, 562–63 (W.D.Pa.1996); *Gannon,* 920 F.Supp. at 580; *Klein v. Boyd,* No. 95–5410, 1996 WL 230012, at *4 (E.D.Pa. May 3, 1996); *Wiley v. Hughes Capital Corp.,* 746 F.Supp. 1264, 1294 (D.N.J.1990); *In re*

*Avant–Garde Computing Inc. Sec. Litig.*, No. 85–4149, 1989 WL 103625, at *3 (D.N.J. Sept.5, 1989); *Rubin v. Posner*, 701 F.Supp. 1041, 1046–47 (D.Del.1988); *Hartman v. Blinder*, 687 F.Supp. 938, 944 (D.N.J.1987); *In re Catanella and E.F. Hutton and Co., Inc.*, 583 F.Supp. 1388, 1414–15 (E.D.Pa. 1984); *but see In re the Prudential Ins. Co. of Am. Sales Practice Litig.*, 975 F.Supp. at 608 (finding that plaintiff need not demonstrate that its investment declined in value).

█ "Transaction causation focuses on whether the misrepresentation induced the plaintiff to buy the security." *Edward J. DeBartolo Corp.*, 928 F.Supp. at 562; *see Wiley*, 746 F.Supp. at 1294. It is "akin to the traditional tort notion of but-for causation." *Klein*, 1996 WL 230012, at *4. Accordingly, in order to satisfy transaction causation, "a plaintiff must plead, much more prove, that 'but for' the misrepresentations, he/she would not have engaged in the transaction in question." *Edward J. DeBartolo Corp.*, 928 F.Supp. at 562.

█ "Loss causation is defined as a 'causal link between the alleged misrepresentations and the harm incurred when a security is purchased and sold.'" *Angelastro v. Prudential–Bache Sec. Inc.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The harm or loss involved must be economic in nature. *See In re Bell Atlantic Corp. Sec. Lit.*, 1997 WL 205709, at *22. "[L]oss causation looks to whether the misrepresentation caused the plaintiff's pecuniary injury." *Edward J. DeBartolo Corp.*, 928 F.Supp. at 562. As such, "the plaintiff must show 'that the fraud caused the decline in value rather than merely inducing the transaction.'" *Gannon*, 920 F.Supp. at 580; *Wiley*, 746 F.Supp. at 1295. In addition, loss causation "requires a plaintiff to prove that the misstatement was the direct, or proximate, cause of the injury." *Edward J. DeBartolo Corp.*, 928 F.Supp. at 562. It is akin to "tort law's proximate causation." *Klein*, 1996 WL 230012, at *4.

Although the Third Circuit has not directly addressed the issue of loss causation, it appears to have adopted such a requirement in Rule 10b–5 cases. In *In re Phillips Petroleum Securities Litigation*, the Circuit listed proximate cause as an element of a Rule 10b–5 claim. It stated: "The misrepresentations must touch upon the reasons for the investment's decline in value." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d at 1244 (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.), *aff'd in part, rev'd in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). This statement has been interpreted as an endorsement of the loss causation requirement. *See, e.g., Edward J. DeBartolo Corp.*, 928 F.Supp. at 562; *Klein*, 1996 WL 230012, at *4; *Wiley*, 746 F.Supp. at 1294. In so endorsing, the Third Circuit joins several other circuit courts that have expressly adopted the requirement of loss causation in Rule 10b–5 cases. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992); *McGonigle v. Combs*, 968 F.2d 810, 820 (9th Cir.), *cert. dismissed sub nom., Casares v. Spendthrift Farm. Inc.*, 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992); *Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir.1991), *cert. granted*, 502 U.S. 1090, 112 S.Ct. 1159, 117 L.Ed.2d 407, and *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 411 (1992), and *aff'd*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 682 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989).

█ Despite significant authority to the contrary, EPM argues it needs to demonstrate only transaction causation. *See* Opposition Brief at 24–28. In support of its contention, EPM relies upon the decision of the Third Circuit in *Angelastro*. Such reliance by EPM is misplaced for several reasons. First, the distinction between "loss causation" and "transaction causation" was not addressed in *Angelastro*. *See Angelastro*, 764 F.2d at 939. Second, the decision in *Angelastro* was issued before the Circuit decided *In re Phillips Petroleum Securities Litigation*. Finally, decisions from district courts within this circuit and from other circuits indicate that "loss causation" must be alleged and established to succeed in a Rule 10b–5 case. *See, e.g., Edward J. DeBartolo Corp.*, 928 F.Supp. at 562–63; *Gannon*, 920

F.Supp. at 580; *Klein,* 1996 WL 230012, at *4 (E.D.Pa. May 3, 1996); *Wiley,* 746 F.Supp. at 1294; *In re Avant–Garde Computing Inc. Sec. Litig.,* 1989 WL 103625, at *3; *Rubin,* 701 F.Supp. at 1046–47; *Hartman,* 687 F.Supp. at 944; *In re Catanella and E.F. Hutton and Co., Inc.,* 583 F.Supp. at 1414–15; *see also Citibank, N.A.,* 968 F.2d at 1495; *McGonigle,* 968 F.2d at 820; *Arthur Young & Co.,* 937 F.2d at 1310; *Bastian,* 892 F.2d at 682; *Bruschi,* 876 F.2d at 1530.

More importantly, the Reform Act, which is applicable to the instant action, expressly requires proof of "loss causation." Section 21D(b)(4) provides:

*Loss Causation —*

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4) (emphasis added).

 EPM has alleged transaction causation, albeit in conclusory fashion, by stating it would not have purchased the Securities but for the Alleged Misrepresentations. *See* Amended Complaint at ¶¶ 32–33. EPM does not allege in the Amended Complaint, however, that the value of its investment in Echo-Cath has declined. *See* Amended Complaint. EPM merely states, without explanation, that it has "sustained substantial financial losses" as a direct result of the fraudulent misrepresentations. *See* Amended Complaint at ¶ 34. Because the Amended Complaint does not allege specifically why or how EPM was damaged, or even that the value of its investment in EchoCath has declined since the time it purchased the Securities, the Amended Complaint fails to alleged loss causation. As observed in *Wiley,* the failure to plead both transaction causation and loss causation is

not a hypertechnical pleading error. As was noted ... in *In Re Catanella* [, 583 F.Supp. at 1414–15,] and ... in *Hartman,* [687 F.Supp. at 944,] ignoring the distinction between transaction causation and causation would transform the defendant into a of the stock, a result which is con-

trary to the purpose of the [F]ederal securities laws.

*Wiley,* 746 F.Supp. at 1294.

### 2. *Common Law Fraud*

 In order to sustain a claim of common law fraud under New Jersey law, the plaintiff must prove the following elements:

(1) defendant made a material misrepresentation of a presently existing or past fact; (2) with knowledge of its falsity; and (3) with the intent that plaintiff would rely thereon; (4) resulting in reasonable reliance; (5) to the plaintiff's detriment.

*Tonelli v. Khanna,* 238 N.J.Super. 121, 129, 569 A.2d 282 (App.Div.), *certif. denied,* 121 N.J. 657, 583 A.2d 344 (1990) (citing *Jewish Center of Sussex Cty. v. Whale,* 86 N.J. 619, 432 A.2d 521 (1981)). These elements are substantially the same as the requirements for proving securities fraud under Rule 10b–5.

As explained below, supplemental jurisdiction over the state law cause of action is not exercised because the Amended Complaint does not state a claim under Federal law for securities fraud and no other Federal cause of action is asserted in the Amended Complaint.

### B. *Standard For Dismissal Under 28 U.S.C. § 1367(c)*

 In the Amended Complaint, EPM alleged this court has supplemental jurisdiction over its common law fraud claim pursuant to Section 1367. Section 1367 provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the

joinder or intervention of additional parties.

\* \* \* \* \*

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

\* \* \* \* \*

(3) the district court has dismissed all claims over which it has original jurisdiction. . . .

28 U.S.C. § 1367. Supplemental jurisdiction enables Federal courts to hear state law claims over which there is no independent basis of jurisdiction. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Lee–Patterson v. New Jersey Transit Bus Operations*, 957 F.Supp. 1391, 1393–94 (D.N.J.1997).

Subsection (c) of Section 1367 permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." *See id.* The Circuit has stated:

> [W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.

*Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995).

The only basis for Federal jurisdiction in this case is the Rule 10b–5 claim by EPM.[15] As discussed above, this claim must be dismissed because EPM failed to plead it with particularity and also because EPM failed to allege the requisite elements. Accordingly, because no other ground for supplemental jurisdiction is alleged and considerations of judicial economy, convenience and fairness to the parties do not justify the adjudication of the action in this forum, the pendent state law claim by EPM for common law fraud also is dismissed.

**15.** It appears diversity jurisdiction is lacking. *See* 28 U.S.C. § 1332. New Jersey is the princi-

*Conclusion*

Based on the foregoing reasons, the warnings and cautionary statements in the several documents discussed served to negate any potentially misleading aspect of the Alleged Misrepresentations. The 17 January 1996 Prospectus, the 1996 10–K of EchoCath and the 1997 10–Q of EchoCath clearly and precisely cautioned that EchoCath represented an exceptionally risky, indeed speculative, investment. The Motion to Dismiss is granted; the action is dismissed with prejudice.

pal place of business of both EPM and EchoCath. *See* Amended Complaint at ¶¶ 1, 2.